F. Rodney Paine and Anna H. Paine, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Cecil B. Myers Trust u/w Lucy N. Myers, Deceased, Cecil B. Myers, James S. Matteson, and Northern Minnesota National Bank, Trustees, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 46036, 46237. Filed November 30, 1954.

*Lawrence R. Graving, C. P. A.,* and *H. A. Dancer, Esq.,* for the petitioners.

*Merl B. Peek, Esq.,* for the respondent.

392

394

OPINION.

FISHER, *Judge:* The primary issue presented for our consideration involves the determination of whether increment or profit realized in conjunction with the sale of non-interest-bearing notes constitutes ordinary income or is capital gain, upon the facts of the instant case. The trustees of the two Paine trusts and the Cecil B. Myers Trust acquired the notes in the manners set forth in our Findings of Fact. Each note was worth substantially less on the date of issue than the face value at the date of maturity. Ten days before each note matured, a transfer was effectuated and petitioners realized an amount equal to the face value of each note less 3 per cent discount for the 10 days until maturity. The transfers constituted a deliberate and planned effort to comply with the "sale or exchange" requirements of the capital gains provisions to be found in section 117(a)(4) of the Internal Revenue Code. Respondent challenges these transfers. It is the respondent's contention that the transfers were a mere "sham," and that they were not made in good faith. Petitioners reported

one-half of the increment or profit realized (deducting only trustees' fees) in their several income tax returns as gain derived from the sale of capital assets held for more than 6 months. Respondent contends that the profit realized (equal to an annual increment in value at a simple rate of 5 per cent) represented compensation in the form of interest (discount) for the use of borrowed monies or the right of deferred payment in the purchase of ore tracts by Oliver, and is taxable as ordinary income within the meaning of section 22(a). In the alternative, respondent urges us to hold that the amounts received are includible in gross income in the years received as rents and royalties within the meaning of sections 22(a) and 119(a)(4) of the Internal Revenue Code of 1939.

In determining whether the transactions involved in the instant case constituted "sales" within the meaning of section 117 (a) (4), we accord to the word "sale" its ordinary meaning. *Hale* v. *Helvering*, (C. A., D. C. Cir., 1936) 85 F. 2d 819; *Commissioner* v. *Korell*, 339 U. S. 619 (1950). In applying it here, we must give consideration to the total complex of circumstances surrounding the transfers.

Each of the non-interest-bearing notes in question was transferred to a bank 10 days before maturity. The transferee bank recorded the transaction by debiting an account designated as "Loans and discounts" and issuing a cashier's check for the face value of the note less 3 per cent, crediting a cash account designated as "Cashier's checks." Mr. Ray Chabot, vice president and trust officer of the Northern Minnesota National Bank, testified concerning the nature and purpose of the transactions, as follows:

Q. * * * Will you tell us in your own words the nature of that transaction?

A. On the date of that transaction we sold the note to the Northwestern State Bank for the cashier's check that was returned to us in payment, and on that date we credited the account for the trust for the proceeds received for the note.

Q. You stated that you sold that note. Was there any agreement implied or otherwise to the effect that under any circumstances you might have acquired title to that note?

A. Not to my understanding there wasn't any. We made an out-and-out sale so far as our intent or approach to the transaction.

Q. It was your intent on behalf of this trust to divest that trust completely of all property in that note by a sale?

A. That is correct.

Q. Assuming that you had not desired to sell that note on behalf of this trust but rather to effect its collection at maturity, might your treament of that note been any different than it was?

A. I believe we would have held it to maturity and then presented it across the street for payment on the date it was due.

Q. Do you sometimes use your own bank as a collection agent for receivables in trust?

A. Sometimes, and sometimes from our trust department we send the item out for collection by one of the clerks in the trust department.

Q. In this particular case, however, you negotiated directly with the Northwestern State Bank and, in your opinion, made a sale of that note?

A. That is correct.

\* \* \* \* \* \* \*

### Cross Examination.

Q. Mr. Chabot, what was the purpose of making this transfer of the notes ten days prior to maturity of such notes?

A. The sale was made in order to come in as a sale of capital assets.

Q. In other words, you made this transfer in order to take care of the sale or exchange provisions?

A. We sold the notes specifically intending to comply with the means available to us to obtain a capital gain transaction.

Q. Assuming the notes had been held until maturity, what would have been the effect of the increment in value realized by the trust?

A. I would say that that might be a matter of dispute because under Section 117 (f) of the Code, if these notes were construed to be in registered form that then they would be treated upon payment as a sale or exchange, but there is some question in our mind, it occurred, as to whether or not these notes specifically under the cases met the requirements of Section 117 (f) and, therefore, to make sure that the benefit for the trust account was obtained under a capital gain, we sold the notes.

Q. During the years or since 1917 there have been a good many of these notes in existence in your area, isn't that true?

A. That is true.

Q. Have other transactions similar to this taken place with respect to those notes, I mean, specifically, transfers just before maturity?

A. Do you mean with respect to our trust accounts or with people in general in the area?

Q. People in general in the area.

A. I would say in both instances the notes have been sold and disposed of prior to maturity, in some cases several years before maturity; in general, however, very close to maturity.

Q. And then is it common knowledge in your community that an alleged sale or exchange about which you speak is necessary to get capital gain treatment on the increment?

A. I wouldn't say it is common knowledge but I know it's been the practice that has been followed by several people, and I think in connection with these particular accounts the owners had followed that practice prior to the time that this particular trust was created.

Q. Mr. Chabot, how did this matter of making this transfer just before maturity come to your attention?

A. At the time or shortly after the notes were delivered to us we made a tickler out to bring them up with the idea of considering sale, and I think on the 10th of the month the tickler came up so as to give us an ample time to make arrangements for a sale of the notes.

Q. What was responsible for the tickler about which you speak?

A. With the idea that the practice had been established of selling notes by other people and we felt that it is our duty to take the most economical way for the taxpayer in handling an account. That was our duty as trustee, not to follow the most expensive route, and we felt that by a sale that we met the qualifications of the capital gain.

\* \* \* \* \* \* \*

This testimony was uncontroverted.

Respondent has urged us to find that the transfers of the Oliver notes were not bona fide, and that they did not, therefore, constitute "sales" within the meaning of section 117 (a) (4). While the transfers were deliberately planned for the purpose of minimizing taxes, we find that the sales were absolute, and were effectuated in good faith by the trustees in the belief that their acts in so doing were proper and would result in capital gains treatment of the profit. We held in *John D. McKee et al., Trustees*, 35 B. T. A. 239 (1937), that the sale of bonds (coupons detached), maturing on February 1, 1931, at par on January 31, 1931, with full knowledge that the bonds were to be redeemed at face value at maturity, to insure taxation of the resulting gain at capital gains rates, was a transfer made in good faith. In that case as in the instant case, the trustees "were acting for the best interests of the trusts" hoping to obtain "the savings in tax that would accrue to the trusts if the profits were realized on a sale rather than on the redemption of the bonds." 35 B. T. A. at p. 242. Similarly, in *Conrad N. Hilton*, 13 T. C. 623 (1949), a bona fide unrestricted sale was recognized despite the motive to save taxes. See also *Stanley D. Beard*, 4 T. C. 756 (1944); *W. P. Hobby*, 2 T. C. 980 (1943); *Clara M. Tully Trust*, 1 T. C. 611 (1943), where we held that preferred stock which had been called for redemption might be the subject of an unrestricted bona fide sale to a third person in order that there might result a long-term capital gain and a lesser tax liability than would have resulted had the stock been held for redemption.

Respondent argues that the proceeds of the transfers made 10 days before maturity were in fact loans, and, in support of this view, points to the treatment of the items on the books of the transferee bank. The transferee bank debited an account designated as "Loans and discounts," issued a cashier's check for the face value of the notes less 3 per cent for the 10 days until maturity, and credited a cash account designated as "Cashier's checks." The entries are ambiguous, and the word "discount" could refer either to the purchase of an obligation at less than face value or to an advance deduction of interest in conjunction with a loan. Under the circumstances, the entries have little significance in the determination of the issue before us. Moreover, we have found that the transactions were in fact sales, and "book entries must give way to facts." *Doyle v. Mitchell Bros. Co.*, 247 U. S. 179 (1918). The "substance of the transaction" is controlling "rather than form inconsistent therewith." *Clarence E. Lehr*, 18 T. C. 373 (1952); *Conrad N. Hilton, supra*.

The respondent's further contention that the transactions were not normal business transactions because of the very small amount of gain the purchaser would realize was in effect denied by this Court in *John D. McKee et al., Trustees, supra*, where it was recognized that

the purchase was one of accommodation and stated that this could not affect the nature of the transaction as a sale.

We come then to consider the fundamental issue raised in this proceeding, namely, whether the increment or profit realized on the sale of the Oliver notes 10 days before maturity is taxable as ordinary (interest) income, or as capital gain. In *Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552 (1932), it was stated that "the usual import of the term [interest] is the amount which one has contracted to pay for the use of borrowed money." In *Deputy* v. *DuPont*, 308 U. S. 488 (1940), interest was defined as "compensation for the use or forbearance of money."

The respondent has determined, in the instant case, that the difference between the basis of the notes acquired by petitioners and the face value of such notes (adjusted to the price at which they were sold just before maturity) was interest in the form of discount. It is our view that if, and to the extent that, this difference in fact represents compensation for use or forbearance of money (as distinguished from other elements, such as marketability, which may likewise be reflected in discount at the time of acquisition) it must be considered interest. The respondent's determination, of course, is presumptively correct and the burden is upon petitioners to show that the increment or profit represents something other than interest.

The respondent supports his position by pointing to the stipulated facts to the effect that the July 20, 1917, value of the notes in the Paine trusts was arrived at by discounting the face amount of the notes on a 5 per cent basis, and that the bases of the several notes held in the Cecil B. Myers Trust were likewise calculated by applying a 5 per cent annual discount rate from the date of decedent's death to the date of maturity. Since the notes did not require annual payments of interest by Oliver, the respondent considers this rate to be a rate of interest agreed upon by the parties to the original sale. He argues that the bases of the notes represent an aliquot portion of the purchase price of the several ore tracts, so that in substance Oliver received the promise of Niles, and Niles and Toledo, to forbear from demanding payment in full of the purchase price of the lands for the period of time until the notes matured. Such forbearance in fact permitted Oliver the unrestricted use of funds equal in amount to the agreed purchase price of the lands.

Petitioners, on the other hand, contend that the aggregate face value of the notes represents the total purchase price of the ore tracts by Oliver from Niles, and Niles and Toledo. In *Ruth Iron Co.*, 4 B. T. A. 1151, 1155 (1926), affd. (C. A. 8, 1928) 26 F. 2d 30, regarding a closely comparable situation, we stated:

The cost of the consideration received in exchange for the mine could be no greater than the fair value, at the date of the exchange, of the mine with which

they parted. * * * Lacking evidence of the fair market value of the mine, at the date of the exchange, the logical assumption is that the petitioners received value for value. That is to say, that the value of the mine was equivalent to the value of the consideration received therefor. If the value of the mine, at the date of the exchange, is equivalent to the cost of the consideration as well as the value of the consideration, it follows as a necessary corollary that the cost of the consideration is equivalent to the value of the consideration.

Applying this principle to the instant case, the bases of the notes being stipulated (and it being obvious that the notes were not worth their face value on July 20, 1917), we think the respondent is correct in his assertion that the value of the notes issued on the date of sale of the ore tracts to Oliver was the actual purchase price. Any increment realized in excess of basis is taxable and the difference between the face value of the notes and the basis is not explainable as, and could not constitute a portion of, the purchase price.

Petitioners make the further contention that the difference between a cash price and a deferred payment price, represented by notes issued in conjunction with a sale of property on a deferred payment plan, may not be considered interest or discount, citing *Henrietta Mills* v. *Commissioner*, (C. A. 4, 1931) 52 F. 2d 931, and *Daniel Bros. Co.* v. *Commissioner*, (C. A. 5, 1928) 28 F. 2d 761. In each of those cases, however, the difference was held not to be interest because the whole of the promised payments constituted the agreed purchase price. In the present case (as was pointed out in *Ruth Iron Co., supra*), we are not dealing "with deferred payment of the purchase price as such."

Under the circumstances we think that the increment in value of the Oliver notes represents compensation to the petitioners paid by Oliver for the use of petitioners' capital (forbearance on Oliver's debt) until the notes matured, and was intended as a payment of interest (discount) at a simple 5 per cent rate by Oliver to Niles, and Niles and Toledo, or their successors. This increment comes within the definition of gross income under section 22 (a) as "gain or profit" in the form of "interest" and is taxable as ordinary income in the absence of express provisions to the contrary in section 117.

We first consider the question of whether the sale by petitioners of the Oliver notes effectively altered the nature of the increment realized. If the notes had been held and redeemed at maturity, there would have been merely a collection of a debt which would not have constituted a sale or exchange. Any increment realized would have been taxable as ordinary income. *Fairbanks* v. *Commissioner*, 306 U. S. 436 (1936) ; *Lee* v. *Commissioner*, (C. A. 7, 1941) 119 F. 2d 946. There is no evidence that these notes were in registered form so as to have qualified, if redeemed, as an exchange within the meaning of section 117 (f).

Petitioners assert that our holding in *George Peck Caulkins*, 1 T. C. 656 (1943), precludes a determination that increment realized on the sale of the Oliver notes is other than capital gain. In the *Caulkins* case, the taxpayer paid in $15,043.33 over a 10-year period on an "Accumulative Installment Certificate," in registered form, which provided for payment of $20,000 at the end of the 10-year period. The increment was identical with interest compounded at 5½ per cent during the 10-year period. It was held that the redemption of the certificate which was in registered form was to be treated as an exchange under the provision of section 117 (f) of the Revenue Act of 1938, and that the gain realized by the taxpayer was accordingly capital gain, taxable at a reduced rate. The Tax Court was affirmed in *Commissioner* v. *Caulkins*, (C. A. 6, 1944) 144 F. 2d 482, where it was said:

The decisive question is whether *the amount* received by the taxpayer falls within § 117 (f), which provides that *amounts* received by the holder upon retirement of the securities named shall be considered as *amounts* received in exchange therefor. * * * The Revenue Act of 1934 made a radical change in the prior law when it provided [sec. 117 (f)] that *amounts* received on retirement of the securities listed should be calculated as capital gain or capital loss. [Emphasis supplied.]

    \*     \*     \*     \*     \*     \*     \*

Clearly $20,000 was *the amount* received on the retirement of the certificate, and under the plain wording of § 117 (f), it was taxable as a capital gain. [Emphasis supplied.]

The effect of the holding in the *Caulkins* case is, therefore, that any increment realized on the retirement of an obligation which qualifies within the meaning of section 117 (f) as "bonds, debentures, notes, or certificates or other evidences of indebtedness issued by a corporation * * * in registered form" is part of *that amount* which is deemed to have been received as a result of an exchange, and is thus entitled to capital gains treatment.

We think it is clear, that the decision in the *Caulkins* case was based solely upon the precise language of section 117 (f) which left no doubt that the *entire* amount received as a result of retirement of notes in registered form was to be deemed received in exchange for such notes despite the recognition by both Courts that the increment there under consideration was essentially interest. It is obvious, however, that section 117 (f) is not here applicable because there was no retirement of the notes, and there is no evidence that the notes were in registered form.

The support, if any, for petitioners' contention must be found in section 117 (a) (4), the significant language of which is as follows: "The term 'long term capital gain' means gain from the sale or ex-

change. of a capital asset." We think that in the instant case, section 117 (a) (4) must be viewed in conjunction with section 22 (a), where the significant language is that gross income "includes gains, profits, and income derived from * * * interest * * *."

We have already found that the increment in the instant case in fact represented interest, and it is clear that it should be taxed as ordinary income unless the provisions of section 117 (a) (4) require that it be taxed as capital gain. A careful reading of section 117 (a) (4) fails to disclose any equivalent of the language in section 117 (f) which was the decisive factor in the *Caulkins* case or any other provision which requires us to convert what is in fact interest into capital gain.

In the light of the foregoing, it is our view that the *Caulkins* case is clearly distinguishable from the case before us.

Petitioners argue that the Oliver notes were property within the meaning of section 117 (a) (1), defining capital assets, held for more than 6 months, and sold within the meaning of section 117 (a) (4). Clearly the Oliver notes were in one sense of the word *property*, as is every other tangible object and intangible right. It is our view, however, that in the absence of express language to the contrary in the statute, the increment, if it is to qualify as a capital gain, must properly be in the nature of an attribution to capital and neither flow as income therefrom nor stand in lieu of income therefrom. The circumstances giving rise to the issue before us present a frank attempt to convert ordinary income into capital gain. Such efforts are no doubt to be expected in the background of a tax structure which accords favorable treatment to capital gains by taxing them at a reduced rate. By the same token, plans directed to such purposes invite close scrutiny and careful sifting.

It is generally recognized that a right to payment arising from the ownership of property is income, and while also a form of *property*, it is not such a capital asset that can be sold to achieve a capital gain. Amounts received in anticipation of income, or in lieu of accrued rights to income must stand in place of the income that would otherwise have resulted and be taxed accordingly. *Hort* v. *Commissioner*, 313 U. S. 28 (1941). The reasoning in the cases involving anticipatory transfers of the right to income seems to us to present a realistic and practical approach to the problem at hand. See *Helvering* v. *Horst*, 311 U. S. 112 (1940) ; *Charles T. Fisher*, 19 T. C. 384, affd. (C. A. 6, 1954) 209 F. 2d 513, certiorari denied 347 U. S. 1014.

It is immaterial that the notes were in some sense single pieces of property. The form of obligations is not determinative of their real nature for Federal income tax purposes. Only a part of the obligations represented a capital investment, and no part of the increment represented a natural increase in capital. The increment, representing

payment for the use of the capital investment, in effect promised in a lump sum upon maturity, is calculable, and is easily severable from the underlying capital investment. Cf. *Commissioner* v. *Kieselbach*, 317 U. S. 399, affirming (C. A. 3, 1942) 127 F. 2d 359, where that portion of a lump-sum condemnation award, received as upon a sale within the meaning of section 117, held to be interest, was taxable as ordinary income. Inasmuch as the element representing interest is clearly identifiable, we see no reason to treat the problem as differing in any fundamental way from the anticipatory disposition of unmatured interest coupons or other severable rights to collect interest. .

The "original issue discount" reflecting interest and realized on sale before maturity is closely analogous to that of the sales price representing accrued interest in the case of a bond sold between interest dates, which is treated as ordinary income. Cf. *Charles T. Fisher*, *supra*. In each case respectively, interest does not really accrue until either the note matures or the interest coupons mature. An increment is nevertheless reflected in the purchase price because of the probability of the timely payment. And that portion of the sales price representing interest must be treated as ordinary income. See *Rhodes' Estate* v. *Commissioner*, (C. A. 6, 1942) 131 F. 2d 50, regarding the sale of a right to a declared dividend before the date of payment.

It is our conclusion that the sale of the right to interest income merely accomplished, prior to maturity, the realization of income rights which, if they had been permitted to mature, would have constituted ordinary income. We hold, therefore, that the increment so realized is to be taxed as ordinary income.

It is unnecessary, in the light of the foregoing, to consider respondent's further contention that the profit realized by petitioners was taxable as rents or royalties within the meaning of sections 22 (a) and 119 (a) (4) of the Internal Revenue Code of 1939.

Reviewed by the Court.

*Decisions will be entered under Rule 50.*

---

Murdock, *J.*, concurring: The statement of the issue is "whether the increment or profit realized upon the sale, 10 days prior to maturity, of certain non-interest-bearing notes originally issued on a discount basis for substantially less than their face value, is taxable as ordinary (interest) income, or as capital gain." It may be assumed from this statement and from the findings as to bases that a portion of the purchase price was to be paid in notes on which no interest was specified but the face amount of the notes was to include interest and was arrived at by computing interest at 5 per cent to the date of maturity of the notes and adding it to the principal amount owed on that portion of the purchase price. The amount thus added was, and was intended

to be, discount, the equivalent of interest, to the extent to which it would ultimately be received by the seller-creditors. The latter chose not to hold the notes to maturity but transferred them to a third party 10 days prior to maturity for an amount slightly less than the face amount of the notes. The excess thus received over the bases of the notes was a realization by the petitioners of the discount involved in the original delivery and receipt of those notes. That discount was the equivalent of interest for the forbearance with respect to that part of the purchase price and is taxable in full as interest. *Charles T. Fisher*, 19 T. C. 384, affd. 209 F. 2d 513, certiorari denied 347 U. S. 1014.

RAUM, *J.*, agrees with this concurring opinion.