F. Rodney PAINE and Anna H. Paine, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Cecil B. MYERS TRUST u/w Lucy Myers, Deceased, Cecil B. Myers, James S. Matteson and Northern Minnesota National Bank, Trustees, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

Nos. 15332, 15333.

United States Court of Appeals Eighth Circuit.

July 10, 1956.

John W. Hughes, Chicago, Ill. (John E. Hughes and Harold R. Burnstein, Chicago, Ill., with him on the brief), for petitioners.

David O. Walter, Atty., Department of Justice, Washington, D. C. (H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack and Hilbert P. Zarky, Attys., Department of Justice, Washington, D. C., with him on the brief), for respondent.

Before WOODROUGH, JOHNSEN and VOGEL, Circuit Judges.

JOHNSEN, Circuit Judge.

The Tax Court held, 23 T.C. 391, that each of two unrelated trusts had derived ordinary income, and not capital gain as reported in their tax returns, from sales of similar notes made by them in the years 1947, 1948 and 1949. Both situations, in their tax consequence, are before us on petitions to review the Tax Court's decision.

Such differences in details as exist between the two situations are admittedly without significance on the result here, so that the facts can for present purposes be stated generally, in common application to both cases.

Niles Land Co. was the owner of a number of tracts of land in the iron-range section of Minnesota. So far as its ownership was concerned, the property apparently had no use or value, except in relation to the ore which it contained. Niles accordingly engaged in making leases with mining companies, under which it would receive a fixed royalty per ton on all ore removed, with provision for a minimum sum to be paid to it annually under each lease.

On the two tracts related to the present situation, Niles had entered into such leases, on May 1, 1902, with Chemung Iron Co., for a 50-year term. Chemung later assigned the leases to Oliver Mining Co. In 1915, Niles made claim that one of the leases had been breached and sought to have it cancelled, but the court held that no violation of the lease provisions had occurred. See Niles Land Co. v. Chemung Iron Co., 8 Cir., 234 F. 294. Thereafter (perhaps, among other reasons, to escape further lease controversies) Oliver negotiated with Niles for a purchase of the land. The two leased tracts were resultingly sold by Niles to Oliver on July 2, 1917, with deeds of conveyance being made to Oliver and purchase-money mortgages being executed in favor of Niles.

The record contains a stipulation that the agreed purchase price for the one tract was $4,739,978.25, and for the other $1,347,325.00. According to the stipulation, these purchase prices were arrived at by taking the number of tons of ore which mining engineers, representing the parties, estimated that each tract contained and multiplying this quantity by a value for the ore of 25 cents per ton. Niles further agreed that the royalties which had theretofore been paid to it under each lease should be credited as payments upon the purchase price. Promissory notes, with Oliver as maker and United States Steel Corporation as guarantor, were duly issued to the order of Niles for the balance, aggregating as to the one tract $4,461,853.25, and as to the other $1,314,935.00, and secured respectively by the mortgages referred to above.

The notes of each transaction were in serial form, with equal amounts of the purchase price maturing every six months, up to July 1952, and with a provision in each instrument that it was "without interest until after maturity." There was an impairment-of-security clause in the mortgages, to the effect that, if, at the maturity date of any note, more ore should have been removed from the land than an amount equal in value, at 25 cents per ton, to such part of the purchase price as had up to that time been paid, the mortgagor should forthwith make payment, upon the next maturing notes, of "a sum equal to the value of such excess quantity of ore at the rate of twenty-five (25) cents per ton * * as advance payments upon said notes."

The mortgagor was not, however, entitled to any allowance or deduction from the face amount of the notes, by reason of such advance payments being made upon them before their maturity. Nor was there a right to any allowance or deduction from the face amount of the instruments for any other prepayments which the mortgagor might desire to make. Also, under the acceleration clause of the mortgages, the mortgagor was li-

able for payment of all the notes in their full amount at any time, in case of a default on its part, for more than 30 days after written notice by the mortgagee, in failing to make payment of any individual note at its maturity, or in failing to make advance payments upon the notes for ore removed in excess of the amount of the purchase price which had up to that time been paid, or in failing to keep taxes and assessments current as required by the mortgage—if the mortgagee elected "to declare the entire amount of the said promissory notes to be due and payable."

Thus, Oliver and United States Steel, as its guarantor, were subject to an absolute obligation to pay the full face amount of the notes under all conditions —whether the instruments should be paid before their maturity dates by advance payments made because of diminution in the amount of the security, or otherwise, or whether they might acceleratedly be caused to become due from a default, even though this should occur only six months after their issuance. The significance of this aspect will be apparent later, in our discussion of the Tax Court's holding that part of the face amount of the notes "was intended as a payment of interest"; that such part "is not explainable as, and could not constitute a portion of, the purchase price"; and that the amount thereof accordingly would, at whatever time it was received (here on sales made by the holders of the notes shortly before their maturity dates), represent ordinary income and not capital gain derived from holding the securities. 23 T.C. at page 400.

The stipulation in the record further states that, upon conveyance of the lands being made to it, Oliver had set up on its books and records, as its basis for the property in each case, the face amount of the notes and mortgage, and that this basis had been used by it continuously, since 1917, for depletion purposes. And in this connection, it may incidentally be observed that the record is without even so much as an intimation that Oliver had at any time claimed, against Niles, or for

its own tax purposes, or in any other connection, that any part payable on the notes represented in the transactions something other than agreed and deferred purchase price, either interest or other element.

Niles—as would naturally be done, we think, in respect to any such long-term, noninterest-bearing securities, for tax purposes and to facilitate the distribution which it contemplated making of the notes to its stockholders—immediately set up a basis for the notes of less than their face amount, computed in the particular situation by applying 5 per cent (the year was 1917) equivalently as a discount rate to each year of the term of the note. The parties give this illustration in their stipulation: "For example, the July 20, 1917 value of the note due on July 20, 1948 [one of those here involved] in the face amount of $31,943.01 was computed by multiplying 5 per cent times $1 for 31 years, arriving at a result of $1.55. This amount, $1.55 plus $1, or $2.55, divided into $31,943.01, equals $12,526.63." The difference between the face amount of the note and the basis or value which Niles thus computed therefor (in the case of the note used as an example this difference was $31,943.01 less $12,526.63) was what the Tax Court held as to each of the notes here involved "was intended [by Oliver and Niles] as a payment of interest" and "is not explainable as, and could not constitute a portion of, the purchase price."

The stockholders of Niles took over the notes, with their varying maturity dates, on these computed bases, in the distribution which the corporation immediately made to them. The notes here involved came in this manner into the hands of two of the stockholders and later were made the subject of family trusts. In each instance, about 10 days before the maturity date of each of the involved notes, the trustee sold it to a local bank (the note bore the guaranty of U. S. Steel) on a discount basis, the amount of the discount being equal in each case to interest, at the current rate, on the face amount of the note, for the

period remaining until its maturity. Thus, on the note used in example above, the bank, according to the stipulation, made deduction of a sum equal to interest on the face amount thereof, at 3 per cent per annum, for a ten-day period, in its acquisition of the note.

The object of the trustees in thus making sales of the notes before their maturity dates, instead of waiting to have the face amounts paid to them by the maker or guarantor as a retirement of the instruments, admittedly was to qualify the amount derived by the trust from such a note, in excess of its basis, under § 117(a) (4) of the Internal Revenue Code of 1939, 26 U.S.C.A., as "gain from the sale or exchange of a capital asset held for more than 6 months"—the holders not being entitled to treat a payment or retirement of the notes upon maturity, by their corporate maker, as an "exchange" under § 117(f) of the Code, since the instruments were not ones "with interest coupons or in registered form". See Fairbanks v. United States, 306 U.S. 436, 59 S.Ct. 607, 83 L.Ed. 855; Lee v. Commissioner, 7 Cir., 119 F.2d 946.

The Commissioner had contended before the Tax Court that the transfers made of the notes by the trustees to local banks were not bona fide, and that they therefore did not constitute sales within the meaning of § 117(a) (4), but the Tax Court rejected this contention, saying: "While the transfers were deliberately planned for the purpose of minimizing taxes, we find that the sales were absolute, and were effectuated in good faith by the trustees in the belief that their acts in so doing were proper and would result in capital gains treatment of the profits." 23 T.C. at page 398.

The Tax Court's disposition of this issue is not challenged here by the Commissioner, so that the only question which we are called upon to consider is in substance whether the Tax Court further was warranted in finding and concluding as against petitioners—with this view being controlling of its result—

that, as previously quoted from its opinion, a part of the face amount of the notes "was intended as a payment of interest" and "is not explainable as, and could not constitute a portion of, the purchase price."

We are unable to find any probative warrant or rational basis for this finding and conclusion in the facts contained in the record. Under the stipulation of the parties, the lands clearly were sold for definitely fixed purchase prices, "computed [as to the one tract] on 18,959,913 tons of ore at 25 cents per ton, amounting to $4,739,978.25, less royalties theretofore paid pursuant to the lease agreement amounting to $278,125.00", and "computed [as to the other tract] on 5,389,300 tons of ore in the property at 25 cents per ton, amounting to $1,347,325.00, less royalties paid theretofore amounting to $32,390.00." And it also was unmistakably stated in the stipulation "That the balance of the purchase price [after crediting upon the computed ore-basis value of the tract the amount of the royalties received under the previous lease] amounting to $4,461,853.25 [in the case of the one tract, and to $1,314,935.00 in the case of the other] was agreed to be paid by Oliver to Niles in the form of promissory notes." Further, the notes so given by Oliver to Niles totalled in each case the exact amount of this agreed purchase-price balance—not a larger sum, as would have had to be the situation if the notes were to be issued on a basis sufficient to include the purchase price and a discount allowance in lieu of interest.

On these unequivocal facts, the Tax Court necessarily was mistaken when it said, 23 T.C. at page 392, that the notes were "originally issued on a discount basis for substantially less than their face value", and when on this premise it found and concluded that thus a part of the face amount of the notes "was intended as a payment of interest" and "is not explainable as, and could not constitute a portion of, the purchase price". The fact that Niles had, as previously mentioned, on July 20, 1917, for tax pur-

poses and in relation to the distribution which it contemplated making of the securities to its stockholders, adopted or set up a value basis for the notes of less than their face amount, computed by applying 5 per cent equivalently as a discount rate to each year of the term of the notes, could not be held to be legally inconsistent with, and so to permit an ignoring or rejection of, the stipulated transactional facts, of what the agreed purchase price had been between the parties; of how it had been arrived at between them in relation to the ore that the land contained; and of how this mutually determined value and price corresponded exactly with the face amount of the notes.

What Niles did in establishing a tax and distribution basis for the notes, to serve the purposes of itself and its stockholders, could not change the facts of what the transaction between Oliver and Niles had been, as unequivocally set out in the stipulation. Niles' act in this regard would not be capable of amounting to a modification or nullification of the transaction. And beyond the facts in the stipulation as to the basis agreed upon for arriving at the price of the land and the adherence of the parties to the agreement in the amount of the notes issued, there were the additionally indicative incidents in the situation, previously mentioned, that Oliver subjected itself to an absolute obligation to pay the full amount of the notes under all conditions, no matter how soon this amount might be caused to become due from excess ore-removal or from default in any other condition of the mortgage, and further that Oliver conformingly set up on its own records at the time of the transaction the face amount of the notes as representing its cost or purchase basis and used that basis continuously thereafter for depletion purposes.

Again, as we have previously observed, it was not economically unnatural, nor was it legally inconsistent, that Niles should have set up, for tax and stockholder-distribution purposes, a value basis for the notes of less than their face amount, in view of their nature as long-term, noninterest-bearing securities. When the transaction between Oliver and Niles was completed, Niles' status had shifted from that of a land owner to that of a security holder. It was entitled to evalute its economic situation in relation to its changed capital-asset position. Despite such considerational significance as the face amount of the notes had borne in relation to the land transaction, and despite such intrinsic value as the instruments could actually possess for purposes of that transaction from certainty of their ultimate payment, they would still be entitled to be regarded, in Niles' changed-asset position, as not having a market value in the investment or securities field at the time equal to their face amount, because they were without interest for their term.

But this would not permit the nature of the pecuniary reality which the notes actually had been accorded in the land transaction, as unequivocally established by the stipulation, to be refused to be recognized in relation to the property sale. The Tax Court could not baldly conclude, against the actualities shown by the stipulation, that, since the notes as investment securities had a market value of less than their face amount, this value, and not their tonnage-determined face amount, had represented the real, agreed purchase price of the lands, so that the difference between their face amount and their investment-market value necessarily "was intended as a payment of interest" and "is not explainable as, and could not constitute a portion of, the purchase price."

It may be added that there also would be no room, against the facts of the stipulation, to view it as so unreasonable for Niles in the situation to have sold the lands on a long-term, purchase-payment basis, without requiring the vendee to pay interest, that it could be declared inherently incredible for such a transaction to have occurred. Not only does the stipulation require the holding that it did occur, but the facts of the situation also leave it entirely natural that

the vendor should have seen fit so to do in the particular transaction.

The property, as we have pointed out, was exclusively mineral lands, not shown to have had any use or value except in relation to the ore which they contained. Economic realization thus could come from them in held ownership only through exploitation of the ore, either by leasing or by personal mining operations. Niles had already granted 50-year leases upon the property, at 25-cent royalties, which leases Oliver had come to hold, and under which Niles was without hope of ever getting more out of the land, either in greater or quicker amount (unless the leases became subject to cancellation) than the payments which it agreed to accept in purchase price for a sale and conveyance of them. Payment of the purchase-price notes, the same as the royalties under the lease, was geared to the quantity of ore which it was expected that Oliver would progressively engage in removing—with the maturity dates of the notes being automatically stepped up in correlation to the removal of any greater quantities, and (confirmatory that no interest was involved) with Oliver being obligated to pay the full amount of the purchase price in all events, even if this occurred on the basis of immediate right of acceleration from a default.

Beyond the views which we have expressed as to the conclusion required by the unequivocal facts, we have not been able to find any decision tending to support what the Tax Court did. Ruth Iron Co. v. Commissioner, 8 Cir., 26 F.2d 30, 33, cited by the Tax Court, held that the difference between the face amount of purchase-price notes, such as are here involved, and their fair market value at the time they were issued would, on payment of them by the maker, constitute "taxable gains, profits, or income," but it did not purport to declare that the increment represented "interest" and not "long-term capital gain". The statute as it existed at that time (before the Revenue Act of 1921) was without provision for special treatment of capital gains, so that, as the Government's brief concedes,

"it was not necessary in that case to determine the nature of the increment."

Such an increment, ostensibly constituting part of deferred, purchase price, necessarily must, we think, be regarded as giving rise to capital gain, and not to a realization of interest, when, as here, it unequivocally appears, both from the face of the transactional instruments, and from the circumstances underlying the parties' dealings as well, that it constitutes in fact agreed purchase price and nothing else. Cf. Henrietta Mills, Inc., v. Commissioner, 4 Cir., 52 F.2d 931; Daniel Bros. Co. v. Commissioner, 5 Cir., 28 F.2d 761; McDonald v. Commissioner, 2 Cir., 76 F.2d 513. This, of course, is not to say that purported, deferred purchase price can not in any situation be found to contain disguised, intended interest.

Reversed and remanded.

WOODROUGH, Circuit Judge (dissenting).

I find myself in accord with the decision of the Tax Court and would affirm it.