John S. Taft and Virginia M. Taft v. Commissioner. John Taft Electric Company, a Corporation v. Commissioner.
Taft v. Commissioner
Docket Nos. 83701, 83702.
United States Tax Court
T.C. Memo 1961-230; 1961 Tax Ct. Memo LEXIS 121; 20 T.C.M. (CCH) 1135; T.C.M. (RIA) 61230; August 15, 1961
*121 Held, petitioner has failed to prove that a corporate note given to the corporation's majority shareholder in payment for his transfer to it of a sole proprietorship did not represent a proprietary interest in the corporation rather than an indebtedness. The set-off of a corporate receivable due from the shareholder against the note account represents a distribution taxable as dividend to him. Held, further, on the facts presented, section 382(a) of the I.R.C. of 1954 prevents the corporation from claiming a net operating loss carry-over deduction from prior years. William T. Selby, Esq., 790 E. Santa Clara St., Ventura, Calif., for the petitioners. Edward M. Fox, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in petitioners' 1954 income tax in Docket No. 83701 of $15,800.32 and in Docket No. 83702 of $6,311.93. The questions for decision are whether respondent correctly determined that the individual petitioners in Docket No. 83701 received a distribution from a corporation which was taxable as a dividend, and whether respondent correctly determined that the corporate petitioner in Docket No. 83702 *122 is not entitled to a deduction for a net operating loss carry-over. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Petitioners John S. Taft and Virginia M. Taft are husband and wife and reside in Ventura, California. They filed a joint income tax return with the district director of internal revenue at Los Angeles, California, for the year 1954. Petitioner John Taft Electric Company is a California corporation with its principal place of business in Ventura, California. It filed a corporate income tax return for the year 1954 with the district director of internal revenue at Los Angeles, California. Prior to June 29, 1954 and since about 1947, Taft was the sole owner and proprietor of John Taft Electric Company, a sole proprietorship engaged in the electrical contracting business. All of the assets of the proprietorship, including the contractor's license, were in Taft's own name. In about 1953, in connection with discussions with his attorney over the preparation of a will, Taft decided to incorporate the proprietorship. Rocklite Company, a corporation, was organized in 1945 with 705 shares of $100 par value stock issued at the time of its *123 incorporation. Prior to and perhaps during the year 1952 Rocklite was engaged in manufacturing and selling lightweight aggregate, a construction material. Rocklite had operating deficits from its aggregate business of $3,818.81 in 1950 and $7,599.52 in 1951. By 1953 Rocklite had disposed of its physical assets and was inactive. All of Rocklite's stock was held by one Margaret Keller. Taft's attorney, a director of Rocklite, informed Taft that its shares were available for purchase at $1 per share. On April 12, 1954, Rocklite's directors adopted a resolution amending its articles of incorporation to change its name to John Taft Electric Company and to change the primary purpose of the corporation to electrical contracting. On June 16, 1954, Rocklite's directors adopted a resolution to purchase Taft's proprietorship for $106,931.82. This amount represented the difference between the book value of the proprietorship's assets and liabilities and constituted the book net worth of the proprietorship as of March 31, 1954. Prior to June 16, Taft was in no way connected with Rocklite. His attorney had been a member of its board of directors for some time. On June 16, Taft was elected president *124 of the corporation. On June 29, 1954, Margaret Keller sold 355 shares of her stock in the corporation to Taft, 70 shares to each of his four children, and the remaining 70 shares to five of Taft's employees. She received $1 per share for the stock. As a condition of purchasing the shares of stock the employees entered into an agreement with Taft under the terms of which Taft agreed to purchase and the employees agreed to sell their shares if their employment with the corporation ended. On June 29, 1954, Taft entered into an agreement with the corporation under the terms of which he sold the proprietorship assets to it for $106,931.82 plus the assumption of the proprietorship liabilities. In payment of this amount the corporation gave Taft its promissory note. The note was as follows: PROMISSORY NOTE United States of AmericaState of California
$106,931.82 March 31, 1954 JOHN TAFT ELECTRIC COMPANY, a corporation of said State of California, for value received, hereby promises to pay, on demand, to JOHN TAFT the sum of One Hundred Six Thousand Nine Hundred Thirty-one Dollars Eighty-two Cents ($106,931.82), in lawful money of the United States. JOHN TAFT ELECTRIC COMPANY
By /s/ John *125 Taft, John Taft, President By /s/ William T. Selby, William T. Selby, Secretary The corporation carried this note in an account on its books as a long-term indebtedness. In each of the years 1954 through 1959 the corporation reduced the note account by the balance at the end of the year in an account entitled "Accounts Receivable - John Taft". The amounts entered in this receivable account were derived from items which he purchased from the corporation, items that the corporation paid for him, or items that the corporate bookkeeper charged to him because it was a personal rather than a corporate business item. In 1954 the year-end balance in the receivable account, $25,613.02, was closed to the note payable account to reduce the principal of the note. Taft did not report this amount as income on his 1954 tax return. In the statutory notice respondent included this amount in Taft's income and explained that it was a distribution taxable as a dividend. On its 1954 income tax return the corporation reported taxable income of $94,742.24 before taking Federal income taxes or the net operating loss carry-over into account. A net operating loss deduction of $11,418.33 was claimed as a carry-over *126 of Rocklite's 1950 and 1951 operating losses. Respondent disallowed this amount in the statutory notice. Opinion The basic question to be decided with respect to Taft's case is whether there was a sale of Taft's sole proprietorship assets to the corporation resulting in a bona fide corporate indebtedness to him in the sum of $106,931.82 or whether the transfer of these assets constitutes an equity investment by Taft of risk capital in the corporation. The answer to this question will rule the issue as to whether the amount paid to Taft ($25,613.02) in 1954 was payment of an indebtedness as petitioner contends, or a distribution taxable as a dividend as respondent contends. The question whether advances, in the form of cash or other assets by stockholders to their corporations constitute debts or equity investments, is not new to this Court. This and other courts have enumerated the many and varied factors surrounding transactions of this sort that should be considered. The question is one of fact and the burden is on the taxpayer to establish the debtorcreditor relationship. In Wilbur Security Co., 31 T.C. 938, we set forth 10 determining factors that should be considered on the issue *127 presented here and the Ninth Circuit's affirming opinion ( Wilbur Security Company v. Commissioner, 279 F. 2d 657) added an eleventh. In O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, affirming a Memorandum Opinion of this Court, the facts are similar to those in this case. There the taxpayer who had been in business as a sole proprietor for a number of years formed a corporation with the same name as his proprietorship. He transferred part of his business assets to the corporation in exchange for stock in a controlling amount and later transferred other assets and cash and took back a corporate note and an open account on the corporate books. The Ninth Circuit affirmed our holding that no debtorcreditor relationship had been shown to exist between the taxpayer and the corporation, and it adopted the enumeration of determining factors which it had used in the Wilbur case. The Court said: There are at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness. They are (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence *128 of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions. When we test this case by the criteria set forth in the above quotation, bearing in mind that no single one is determinative, we are convinced petitioner has failed to establish a bona fide corporate indebtedness to him. The note in question has been set forth in our findings of fact. It is entitled "Promissory Note" and is a noninterest-bearing, unsecured, unconditional promise to pay $106,931.82 on demand. In Mullin Building Corporation, 9 T.C. 350, we pointed out that one of the characteristics of an indebtedness is a fixed maturity date; the fact that no interest was to be paid on the note looks more toward equity ownership than debt, see Wetterau Grocer Co. v. Commissioner, 179 F. 2d 158, affirming *129 a Memorandum Opinion of this Court, and 1432 Broadway Corporation, 4 T.C. 1158, affirmed 160 F. 2d 885; the lack of security may negative the conclusion that there was a loan, Erard A. Matthiessen, 16 T.C. 781, affirmed 194 F. 2d 659; and in any event, even if the instrument is, in form, an evidence of indebtedness, the surrounding circumstances may lead to a finding against the taxpayer, Gooding Amusement Co., 23 T.C. 403, affirmed 236 F. 2d 159. The source of the payments in connection with the note is a factor to be considered. John Kelley Co., 1 T.C. 457, reversed 146 F. 2d 466, reversed 326 U.S. 521. Here petitioner admits on brief that payments to be made only out of earnings tend to characterize the payment as a dividend rather than payment of indebtedness, and Taft testified that the note "was paid back whenever it had a little money ahead so it wouldn't hurt the company any." The note was a demand instrument and as such entitled Taft to participate with general creditors. The record does not show that it was in any manner subordinated to other indebtedness, but Taft testified that he and the business had a good credit rating and that he would do nothing to jeopardize *130 the financial condition of the company and that he "certainly would" prefer to see the corporation's creditors paid before he was. Also we note and consider that while Taft held the note he was at all times president of the corporation, its controlling shareholder and presumably he supplied the management of its affairs. The only dividend paid by the corporation during the time Taft's note was being retired was a dividend of $20 per share declared in December 1958 and paid in January 1959. Taft had received a report of examination from respondent in September 1958. It is an understatement to say that at the time the corporation gave Taft the note it was extremely thinly capitalized. Its capital account had been reduced to zero before Taft entered the picture. On the basis of the figures in its financial statement its debt-equity ratio was at least 110,000 to zero. It is to be noted the $1 per share paid Margaret Keller for her stock is not to be considered as paid in capital for the debt-equity ratio. As we view the record, there is no essential difference between the facts here and the more common situation in which a principal shareholder advances funds to his corporation to permit *131 it to invest in its permanent assets such as plant and equipment or which permit it to buy a going business. We have held that shareholder advancements for such purposes are considered to have been placed at the risk of the business. Sam Schnitzer, 13 T.C. 43, affirmed 183 F. 2d 70; Edward G. Janeway, 2 T.C. 197, cf. Gilbert v. Commissioner, 248 F. 2d 399. We think the record strongly supports a conclusion that Taft's interest evidenced by the corporate note should be considered an equity rather than a creditor interest. We therefore hold that he has failed to prove that the respondent was incorrect in his determination that the amount in question was a dividend to him in the year 1954. The second issue is whether the corporation is entitled to a net operating loss carry-over arising from Rocklite's operations in 1950 and 1951. Respondent determined that the net operating loss was not allowable under either section 382(a) or section 269 of the Internal Revenue Code of 1954. The corporation claims a net operating loss deduction for its taxable year ended December 31, 1954 on the basis of losses of the corporation (Rocklite) of $3,818.81 incurred in 1950 and $7,599.52 incurred *132 in 1951. Section 382(a)[1] *133 *134 provides for a special limitation on such carryovers in the case of the purchase of a corporation and a change in its trade or business. Section 394(b)[2] *135 modifies clauses (i) and (ii) of section 382(a)(1)(A) under certain circumstances. Section 7851(a)(1)(A) provides that Chapter 1 of Subtitle A of the Internal Revenue Code of 1954 (sections 1 through 1361) shall apply with respect to taxable years beginning after December 31, 1953. In Herbert J. Kent, 35 T.C. 30, approved section 1.172-1(e), Income Tax Regs.[3] *136 *137 and held, in effect, that the amount of a net operating loss and the years to which such loss may be carried is to be determined under the law applicable to the loss year: the allowance of the net operating loss deduction and the computation of it are to be governed by the law of the year for which the deduction is claimed, including any limitations, modifications or special rules. Thus, in this case, while the amount of the 1950 and 1951 losses and their availability as carryovers in 1954 are governed by the Internal Revenue Code of 1939, the deduction itself, and limitations on it, are to be determined by the Internal Revenue Code of 1954. Section 382(a), as applied to this case, disqualifies a net operating loss carry-over from prior years if three conditions were met by December 31, 1954, the end of the corporation's taxable year; (A) if Taft owned 50 percentage points more of the total fair market value of the corporation's outstanding stock than he did at June 22, 1954; (B) if the increase in his ownership was attributable to purchase by him of such stock; and (C) if the corporation had not continued to carry on a business substantially the same as that conducted before any change in stock ownership took place. Taft is a "person" as described in section 382(a)(2). It is stipulated that on June 29, 1954 Margaret Keller transferred to Taft 355 shares of the total 705 shares of corporate shares outstanding at a purchase price of $1 per share. [4] He had owned no shares in the corporation before this date. We conclude the provisions of section 382(a)(1)(A) and (B) have been met. [5] *138 Petitioner argues that: The change in the primary purpose of the corporation to electrical contracting was dated April 12, 1954. It actually engaged in that business on and after April 1, 1954. The record shows that the corporation (Rocklite) conducted a lightweight aggregate producing business and that for a period of time prior to June 1954 it had been inactive. In addition, the following facts are stipulated: On April 12, 1954, the corporate directors adopted a resolution amending the articles of incorporation so as to change the corporate name and the corporate purpose; on June 16, 1954, the corporate directors adopted a resolution authorizing the purchase of Taft's proprietorship; on June 29, 1954, an agreement of sale of the proprietorship was entered into between Taft and the corporation and signed by Taft as seller, Taft as president of the corporation, and his attorney as corporate secretary. It is stipulated: Prior to June 29, 1954, petitioner John Taft was the sole owner and proprietor of * * * a sole proprietorship which operated an electrical contracting *139 business. It is further stipulated: Since the date of the transfer of the assets from John Taft to the corporation, the business of electrical contracting has been conducted by the corporation. * * * There is little doubt that a change in the nature of the business was effected. The directors approved a resolution to that effect. There is some evidence which seems to indicate that the corporation began doing business before June 1954; the corporate note was dated March 31, 1954; the 1954 corporate tax return contains a statement to the effect that April 1, 1954 was the date the corporation acquired the proprietorship; and Taft's individual tax return reported income from the proprietorship only to March 31, 1954. Although Taft was a witness, he did not testify concerning this point. In so far as there appears to be a conflict between the stipulated facts and the note and tax returns, we base our decision on the stipulated facts. From them we conclude the corporation at the end of its taxable year did not continue to carry on a business substantially the same as that conducted before any change in the percentage ownership of its stock. We hold that section 382(a) bars the corporation's *140 claim to the net operating loss carry-over deduction and that respondent correctly disallowed the deduction to the corporation. This record also amply supports respondent's argument that the operating loss deduction should be disallowed under section 269, Internal Revenue Code of 1954, in that Taft's acquisition of control of the corporate petitioner was for the "principal purpose" of tax avoidance. Decisions will be entered for the respondent. Footnotes
1. SEC. 382. SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) Purchase of a Corporation and Change in its Trade or Business. - (1) In General. - If, at the end of a taxable year of a corporation - (A) any one or more of those persons described in paragraph (2) own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at - (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to - (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years. (2) Description of Person or Persons. - The person or persons referred to in paragraph (1) shall be the 10 persons (or such lesser number as there are persons owning the outstanding stock at the end of such taxable year) who own the greatest percentage of the fair market value of such stock at the end of such taxable year; except that, if any other person owns the same percentage of such stock at such time as is owned by one of the 10 persons, such person shall also be included. If any of the persons are so related that such stock owned by one is attributed to the other under the rules specified in paragraph (3), such persons shall be considered as only one person solely for the purpose of selecting the 10 persons (more or less) who own the greatest percentage of the fair market value of such outstanding stock. (3) Attribution of Ownership. - Section 318 (relating to constructive ownership of stock) shall apply in determining the ownership of stock, except that section 318(a)(2)(C) shall be applied without regard to the 50 percent limitation contained therein. (4) Definition of Purchase. - For purposes of this subsection, the term "purchase" means the acquisition of stock, the basis of which is determined solely by reference to its cost to the holder thereof, in a transaction from a person or persons other than the person or persons the ownership of whose stock would be attributed to the holder by application of paragraph (3). ↩
2. SEC. 394. EFFECTIVE DATE OF PART V. * * *
(b) Section 382(a). - For purposes of applying the special limitation on net operating loss carryovers in section 382(a), the beginning of the taxable years specified in clauses (i) and (ii) of section 382(a)(1)(A)↩ shall be considered to be the beginning of such taxable years or June 22, 1954, whichever occurs later.
3. Regs. § 1.172-1 Net operating loss deduction. * * *
(e) Law applicable to computations - (1) General. The following rules shall apply to all taxable years without regard to whether they began before, on, or after January 1, 1954: (i) In determining the amount of any net operating loss carryback or carryover to any taxable year, the necessary computations involving any other taxable year shall be made under the law applicable to such other taxable year. (ii) The net operating loss for any taxable year shall be determined under the law applicable to that year without regard to the year to which it is to be carried and in which, in effect, it is to be deducted as part of the net operating loss deduction. In applying this rule, however, certain taxable years subject to the Internal Revenue Code of 1939 shall, to the extent provided in paragraphs (a) and (c) of § 1.172-2 and paragraphs (a) and (e) of § 1.172-3, be treated as though subject to the Internal Revenue Code of 1954. (iii) The amount of the net operating loss deduction which shall be allowed for any taxable year shall be determined under the law applicable to that year. (2) Special transitional rules. See section 172(g) for special transitional rules with respect to (i) net operating losses sustained in taxable years ending before January 1, 1954, (ii) net operating losses sustained in taxable years ending after December 31, 1953, and (iii) the net operating loss deduction for taxable years beginning after December 31, 1953, and ending before August 17, 1954. * * *↩
4. Because Taft's stock ownership alone was over 50 percent, we need not reach a consideration of the attribution rules under section 382(a)(3)↩. 5. Although there is no showing of the fair market value of the shares, the 705 shares outstanding were presumably all of the same class. See section 382(a)(1)(A)↩.