INTERNATIONAL FLAVORS & FRAGRANCES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
International Flavors & Fragrances, Inc. v. Commissioner
Docket No. 7768-70.
United States Tax Court
T.C. Memo 1977-58; 1977 Tax Ct. Memo LEXIS 384; 36 T.C.M. (CCH) 260; T.C.M. (RIA) 770058; March 9, 1977, Filed *384 Held: Petitioner made a bona fide sale of its contract (short sale) to deliver British pounds to a third party and the resulting gain is taxable as a long-term capital gain. George Rowe, Jr., and Michael J. Gaynor, for the petitioner. Theodore J. Kletnick, for the respondent. QUEALY
SUPPLEMENTAL MEMORANDUM OPINION QUEALY, Judge: In our opinion filed May 16, 1974 (62 T.C. 232), this Court held that a contract entered into by International Flavors & Fragrances, Inc., (hereinafter referred to as "petitioner") for the future delivery of 1.1 million British pounds sterling at $2.7691 per pound (at short sale) did not constitute a capital asset in the hands of the petitioner and that the gain realized upon the purported *385 sale of that contract prior to maturity was taxable as ordinary income under the rule of Corn Products Co. v. Commissioner,350 U.S. 46 (1955). On appeal to the U.S. Court of Appeals for the 2nd Circuit, the respondent abandoned that position and the court remanded the case for this Court to consider whether the purported sale of the contract in question, prior to the closing date, was a "sale" of property by petitioner within the meaning of section 1222(3)[1] rather than a contract for the buyer to purchase British pounds on petitioner's behalf. In its opinion, the appellate court further noted that this Court is free to take further evidence and to deal with any other issues that may arise. Petitioner is engaged in the creation and manufacture of flavor and fragrance products used by other manufacturers to impart or improve flavor or fragrance in a variety of consumer products. Its activities are conducted on a worldwide basis through numerous foreign corporations which it, directly or indirectly, owns or controls. During the latter part of 1966, petitioner *386 became concerned about a possible devaluation of the British pound sterling and the adverse effect it would have in converting the operations of its British subsidiary into dollars. On December 29, 1966, petitioner entered into a contract with First National City Bank of New York (hereinafter referred to as the bank) pursuant to which petitioner sold to the bank 1.1 million British pounds sterling at $2.7691 per pound, delivery and payment to be made on January 3, 1968. The contract provided that if, prior to the closing date, the market value of pounds sterling exceeded the exchange rate which the bank was required to pay thereunder, the bank could request petitioner to deposit, as security for its own obligation under the contract, cash or its equivalent. Petitioner was additionally subject to certain penalties for noncompliance with the terms of the agreement. The contract further provided that the bank had the power to place liens on any funds of petitioner that were or might come into the possession or control of the bank to enforce its rights under the contract. On November 18, 1967, the British government devalued the pound sterling in terms of the U.S. dollar from $2.80 *387 to $2.40. On December 20, 1967, petitioner entered into an agreement for the sale of its contract to Amsterdam Overseas Corp. (hereinafter referred to as "Amsterdam"), an international banking institution located at 70 Pine Street, New York City. On the same day as the above agreement was entered into, the following events also transpired: (1) Petitioner notified the bank that it had sold its contract to Amsterdam. (2) Amsterdam notified the bank that it had bought the contract. It agreed to assume liability thereunder if the bank would confirm its intent to pay the sum of $3,046,010 upon the delivery of 1.1 million pounds sterling on January 3, 1968. (3) At 4:18 p.m., Amsterdam received notification from the bank of its approval of Amsterdam's purchase of the contract. The bank also confirmed that on January 3, 1968, it would credit the dollar account of Amsterdam with the difference between its own obligation under the contract, $3,046,010, and the dollar cost to Amsterdam of purchasing from the bank, at the prevailing rate of exchange, the 1.1 million pounds sterling needed to close out the contract on such date. (4) At 4:30 p.m., Amsterdam purchased 1.1 million *388 pounds sterling at the rate of $2.4080 from the bank for delivery on January 3, 1968. On December 21, 1967, Amsterdam sent a check to petitioner in the amount of $387,000 representing the price agreed upon for the purchase of the contract. On January 3, 1968, Amsterdam closed out the contract with the 1.1 million pounds sterling purchased short from the bank on December 20, 1967. The net gain to Amsterdam on the transaction was $10,210. On its corporate return for the taxable year 1967, petitioner reported the $387,000 gain realized from the purported sale of its contract with the bank as long-term capital gain. The respondent asserted deficiencies for such year on the basis that the sale of the contract to Amsterdam was a sham and the gain therefrom should have been reported as a short-term gain. In the alternative, the respondent asserted the short sale was a hedging transaction and the gain should have been taxable as ordinary income, a position which he now abandons. There thus remains for decision whether, on the basis of the record in this case, Amsterdam should be deemed to have been acting as agent or broker on behalf of the petitioner. Cf. Frank C. LaGrange,26 T.C. 191 (1956); *389 S.C. Johnson & Son, Inc.,63 T.C. 778 (1975). Admittedly, petitioner sought to sell its contract prior to maturity in order that the resulting gain from the devaluation of the British pound would be taxed as a long-term capital gain, rather than as ordinary income. The fact that a sale of the contract was made prior to maturity in order to minimize the income tax due on the gain does not, as a matter of law, warrant disregarding the sale. Stanley D. Beard,4 T.C. 756 (1945); W. P. Hobby,2 T.C. 980 (1943); Clara M. Tully Trust,1 T.C. 611 (1943); John D. McKee, et al, Trustees,35 B.T.A. 239 (1937). See also F. Rodney Paine,23 T.C. 391 (1954). The question is whether there was, in fact, a bona fide sale by petitioner to Amsterdam. Conrad N. Hilton,13 T.C. 623 (1949). Mr. Peter Fleck, Chief Executive Officer of Amsterdam and a Director of both petitioner and Amsterdam, testified with respect to the facts leading up to the sale in question. [2] As Mr. Fleck testified, *390 because of his relationship to both the seller and the buyer, the price to be paid by Amsterdam was fixed by reference to offers received from third parties. Amsterdam met the best offer. While Amsterdam immediately took steps to eliminate its risk by entering into a contract to cover the short sale, this action was taken wholly independently of the petitioner. There was no agreement that Amsterdam would take such action. On the whole, while the sale by the petitioner was motivated by tax considerations, the record negates any claim that Amsterdam did not in fact buy the contract from the petitioner without restriction. The Court so finds. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.↩
2. Mr. Fleck was unavailable at the first trial of this issue.↩