HENRIETTA MILLS, Inc., v. COMMISSIONER OF INTERNAL REVENUE.

No. 3165.

Circuit Court of Appeals, Fourth Circuit.
Oct. 12, 1931.

Leon F. Cooper and Glessner, Neuland & Cooper, all of Washington, D. C., for petitioner.

Randolph C. Shaw, Sp. Asst. to Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key and John G. Remey, Sp. Assts. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and William E. Davis, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

NORTHCOTT, Circuit Judge.

This case involves income taxes for the fiscal year ending March 31, 1923, in the sum of $35,112.53. The appeal is taken from decision (order of redetermination) of the United States Board of Tax Appeals entered September 13, 1930, reported in 20 B. T. A. 651.

The facts were stipulated and are as follows:

Petitioner is a corporation organized under the laws of North Carolina, with its principal office at Caroleen. It kept its books of account and rendered its federal income-tax returns on the accrual basis of accounting.

On March 16, 1920, J. C. Plonk, R. P. Roberts, J. A. Carroll, and petitioner, as parties of the first part; together with W. S. Forbes and E. B. Springs, parties of the second part; and John M. Miller, Jr., as party of the third part, entered into a written contract, the material parts of which read:

"The parties of the first part on behalf of themselves and others, for and in consideration of the sum of Ten ($10) Dollars, cash in hand to them paid by the parties of the second part, receipt whereof is hereby acknowledged, agree to sell to the parties of the second part, who hereby agree to buy, subject to the terms and conditions hereinafter set forth, Twenty-Five (25%) per cent. of a majority of all of the outstanding stock of the Cherokee Falls Manufacturing Company, of Cherokee Falls, South Carolina, together with an option to purchase the remaining Seventy-Five (75%) per cent. of said majority of said stock as follows:

"1. The parties of the first part agree to deposit with the said party of the third part, on or before the 1st day of April, 1920, Fifty-One (51%) per cent. or more of the entire outstanding Capital Stock of the said Cherokee Falls Manufacturing Company, with the privilege of depositing for their own

account, or for the account of others, with the said party of the third part, on or before the 1st day of July, 1920, any or all of the remaining outstanding Capital Stock of the said Cherokee Falls Manufacturing Company, and the said parties of the second part agree to buy outright Twenty-Five (25%) per cent. of all of the stock of the said Company so deposited with the said party of the third part together with an option to buy the remaining Seventy-Five (75%) per cent. of said stock, and to pay for said option and said Twenty-Five (25%) per cent. of said stock an amount equal to Six Hundred and Fifty ($650) Dollars per share, to be paid to the party of the third part not later than April 10, 1920, for each share of said Twenty-Five (25%) per cent. of the majority of said stock deposited with the said party of the third part on or before April 1, 1920, and with respect to said additional stock deposited with the said party of the third part after April 1st, 1920, and on or before July 1st, 1920, the payment of Six Hundred and Fifty ($650) Dollars a share therefor shall be made to the said party of the third part within Ten (10) days from the date that he shall tender to the parties of the second part any part of said additional stock but settlement for the full Twenty-Five (25%) per cent. of such additional stock shall be made by the parties of the second part not later than July 10th, 1920; and the said option purchased being as follows:

"(a) An option to purchase on January 15th, 1921, an additional Twenty-Five (25%) per cent. of all of said stock deposited with the party of the third part up to and including July 1st, 1920, upon paying therefor to the party of the third part on the said 15th day of January, 1921, the sum of Six Hundred and Eighty and 87½/100 ($680.87½) Dollars, per share; (b) An option to purchase on January 15th, 1922, an additional Twenty-Five (25%) per cent. of all of said stock so deposited, upon paying therefor to the party of the third part on said 15th day of January, 1922, the sum of Seven Hundred and Nineteen and 87½ ($719.87½) Dollars, per share; and (c) An option to purchase on January 15th, 1923, the remaining Twenty-Five (25%) per cent. of all of said stock so deposited, upon paying therefor to the said party of the third part on said 15th day of January, 1923, the sum of Seven Hundred and Fifty-Eight & 87½ ($758.87½) Dollars, per share.

"2. It is understood and agreed that the parties of the first part will have all of the stock deposited with the party of the third part under this agreement, indorsed, assigned, and transferred on the books of the Cherokee Falls Manufacturing Company in such manner as the party of the third part shall direct; that the entire Twenty-Five (25%) per cent. of said stock first purchased by the parties of the second part as hereinbefore set forth, shall within a reasonable time after the date of such purchase, be properly transferred on the books of the Cherokee Falls Manufacturing Company to the parties of the second part, who shall at once assign the same in blank and deliver the same to the party of the third part, who shall hold the same until all provisions of this contract shall have been carried out, or the contract otherwise terminated; and likewise as each option is taken up by the parties of the second part, and the stock optioned thereunder is paid for in full as herein provided, such stock shall be promptly transferred on the books of the Cherokee Falls Manufacturing Company to the parties of the second part, who shall at once assign the same in blank, and deliver the same to the said party of the third part, to be by him held until all the provisions of this contract shall have been carried out, or the contract otherwise terminated; and when all of the provisions of this contract shall have been carried out, the said party of the third part shall then deliver all of said stock to the parties of the second part.

"But in event the parties of the second part shall fail to take up any part of the said option as hereinbefore provided, or shall fail to pay to the said party of the third part within thirty (30) days from the date such option should have been taken up, the full amount of purchase money required to be paid for the stock optioned to be purchased on such date, the said party of the third part is hereby authorized, empowered, and directed, at the expiration of said Thirty (30) days, without further notice to any party, to transfer on the books of the said Cherokee Falls Manufacturing Company, and deliver to the sellers as their interests may appear, all of said stock transferred under this contract to the said parties of the second part, and held by the party of the third part as hereinbefore provided; and the entire amount of money paid by the parties of the second part to the party of the third part for the account of the parties of the first part as consideration for the said stock and the said option, shall be deemed and considered to have been paid for that portion of said option which was not exercised and carried out,

and the parties of the second part shall have no right, claim or demand, upon or against the parties of the first part, or against the party of the third part, or the First National Bank of Richmond, Virginia, for any part of said money, or of said stock. And when the said stock shall have been transferred and delivered to the sellers, the said party of the third part shall thereupon make final settlement under this contract, returning to the various parties of the first part any balance of money or stock due to them, as their interests may appear, and all rights and obligations between the parties of the first part and the parties of the second part under this contract shall thereupon cease, and this contract shall thereupon be terminated.

"3. It is understood and agreed that promptly after April 1st, 1920, all payments then required from the parties of the second part having been made, the parties of the first part will furnish to the parties of the second part the voting control of the stock of the said Cherokee Falls Manufacturing Company, by means of proper proxies for not less than Fifty-One (51%) per cent. thereof, to the said parties of the second part, which proxies, so long as the parties of the second part shall comply with all of the provisions of this contract, and until the stock represented by said proxies shall have been purchased by and transferred on the books of the Company to the parties of the second part, shall be irrevocable; that the present officers and Directors of the Company will promptly resign when and as requested by the parties of the second part, and that full management and control of the Company shall be vested in the parties of the second part from the time that all payments required to be made on April 1st, 1920, shall have been made. But it is distinctly understood and agreed that no dividends are to be paid by the said Company after April 1st, 1920, until all the provisions of this contract required of the parties of the second part shall have been by them fully complied with, and that no lien or encumbrance shall be placed on any of the property belonging to the Company until the provisions of this contract shall have all been complied with by the parties of the second part, and should the parties of the second part issue any additional stock, all of such additional stock indorsed in blank shall be deposited with the party of the third part, and be subject to all of the provisions of this contract in event of any failure of the parties of the second part to comply with the provisions thereof required of them."

The agreement was carried out according to its provisions, and petitioner acquired thereunder 2,000 shares of stock of Cherokee Falls Manufacturing Company; payments being made as follows:

April 1, 1920, 500 shares at $650, $325,000.

January 15, 1921, 500 shares at $680.87½, $340,437.50.

January 15, 1922, 500 shares at $719.87½, $359,937.50.

January 15, 1923, 500 shares at $758.87½, $379,437.50.

Respondent treated the full amounts of $359,937.50 and $379,437.50, paid January 15, 1922, and January 15, 1923, respectively, as a part of the cost of the stock.

On March 15, 1923, petitioner filed its income-tax return for the calendar year 1922 and with the permission of the Commissioner, it changed the basis of its return to a fiscal year ending on March 31, and in September, 1924, it filed its income-tax return for the fiscal year beginning April 1, 1922, and ending March 31, 1923.

Net income for the fiscal year ended March 31, 1923, was reported by petitioner, and has been computed by respondent, by taking nine-twelfths of the income for the calendar year 1922 and the entire income for the three months' period, January 1 to March 31, 1923.

The Board sustained the Commissioner's determination that no part of the amount paid for the stock represented interest paid or incurred. The petitioner seeks a review of this determination.

The pertinent provision of the Revenue Act of 1921, c. 136, 42 Stat. 227, 254, is as follows:

"Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions: * * *

"(2) All interest paid or accrued within the taxable year on its indebtedness, except on indebtedness incurred or continued to purchase or carry obligations or securities (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from taxation under this title. * * * *"

██ It is contended by the petitioner that the purchase price of all the stock was $650 per share as of April 1, 1920, that the total purchase price was to be paid in four install-

934

ments, and that the excess of the later over the first price amounted to what would have been 6 per cent. interest and was in fact interest. It is further contended on behalf of the petitioner that to give the contract any other interpretation would be illogical and utterly ridiculous from a business standpoint.

We cannot agree with petitioner's contention. The courts will not disregard the plain language of a contract or interpolate something not contained in it. Here the language used by the parties is clear and unambiguous, and cannot be ignored however plausible the reasons advanced. The courts will not write contracts for the parties to them nor construe them other than in accordance with the plain and literal meaning of the language used. Van Ness v. City of Washington, 4 Pet. 232, 7 L. Ed. 842; Harrison v. Fortlage, 161 U. S. 57, 16 S. Ct. 488, 40 L. Ed. 616; Robbins v. Rollins, 127 U. S. 622, 8 S. Ct. 1339, 32 L. Ed. 292; Gavinzel v. Crump, 22 Wall. 308, 22 L. Ed. 783; Sheets v. Selden, 7 Wall. 416, 19 L. Ed. 166; Graham v. Business Men's Assur. Co. of America (C. C. A. 10th) 43 F.(2d) 673; Calderon v. Atlas Steamship Co., 170 U. S. 272, 18 S. Ct. 588, 42 L. Ed. 1033; Hammon Consol. Gold Fields v. Powell (C. C. A. 9th) 32 F.(2d) 855.

The fact that the later installments exceeded the first by amounts that equaled 6 per cent. does not of itself prove that the excess was interest. In this transaction there was no element of lending or borrowing, and the excess price paid for the stock later purchased is not to be considered interest but all principal. In re Bibbey (D. C.) 9 F.(2d) 944, and cases there cited.

Nor could usury have been pleaded had the amount of the excess paid for the later purchased stocks exceeded the legal rate of interest. 27 R. C. L. p. 214, and authorities cited under note 11.

It is a significant fact that while the purchasers took over control of the company on the making of the first payments it was agreed that no dividends should be paid until all the provisions of the contract were fully complied with. The record is silent as to the amount of the dividends that would have been expected in due course. The excess of the price of the later over the first stock purchased may have been fixed to care for the dividends that would otherwise have been paid.

Tax liabilities must be determined by what in fact was done. Remington Rand, Inc., v. Commissioner of Internal Revenue,

33 F.(2d) 77; United States of America v. C. W. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180.

The action of the Board of Tax Appeals is accordingly affirmed.