242 F.2d 287
 STANDARD OIL COMPANY, an Indiana Corporation, Appellant,
v.
OGDEN & MOFFETT COMPANY, a Michigan Corporation, Appellee.
OGDEN & MOFFETT COMPANY, Cross Appellant,
v.
STANDARD OIL COMPANY, Cross Appellee.
 Nos. 12885, 12886.
 United States Court of Appeals Sixth Circuit.
 March 20, 1957.
 
 James K. Brooker, Bay City, Mich., Smith & Brooker, Bay City, Mich., on the brief, for Standard Oil Co., appellant and cross-appellee.
 John D. MacKenzie, Saginaw, Mich., Stanton, MacKenzie, Cartwright & Walker, Saginaw, Mich., for Ogden and Moffett Co., appellee and cross-appellant.
 Before SIMONS, Chief Judge, and ALLEN and ALBERT LEE STEPHENS of the Ninth Circuit, Circuit Judges.
 SIMONS, Chief Judge.
 
 
 1
 While the Ogden & Moffett Company, herein designated as the carrier, was delivering gasoline to the Standard Oil Company at the latter's bulk storage plant at Flint, Michigan, a leak developed in its facilities causing gasoline to accumulate on the concrete apron of the plant. Ignited by backfire of the carrier's motor, the resulting fire destroyed the carrier's motor and trailers and Standard's buildings, causing damages to Standard stipulated at Twenty Five Thousand ($25,000.00) Dollars. It had judgment for only half of that amount. Its appeal asserts the inadequacy of the judgment and the carrier's cross appeal denies all liability to Standard. The facts about which there is little dispute will be fully developed.
 
 
 2
 The carrier contracted to transport bulk petroleum products for Standard under written contract dated October 1, 1945, superseding a like agreement made between the parties on March 1, 1941. Pursuant to this agreement, the carrier on October 9, 1953 undertook to transport 8,000 gallons of Ethyl gasoline from Bay City, Michigan, to Standard's bulk depot at Flint. Its facilities comprised a tractor, semi-trailer, and a four-wheel trailer. Nesbitt was its truck driver and Lindley was Standard's employee charged with rupervising the unloading operation. Upon arriving at the Flint depot, Nesbitt parked his equipment at the loading dock, hooked up the hose running from his semi-trailer to the pumpoff pump of his tractor and assisted by Lindley connected the line between the two trailers. Lindley hooked up the hose from the pumpoff pump to Standard's storage tanks. The valves were then opened to allow the flow of gasoline through the hoses and Nesbitt started the tractor's engine from which the pump received its power.
 
 
 3
 The gasoline had just begun to flow through the lines when the tractor engine stalled, due to a vapor lock. Nesbitt noticed that gasoline was leaking from the hose connection between the engine and the semi-trailer and that there was a small leak from his pump. The leak from the hose connection was described by witnesses as 'a small stream.' Nesbitt estimated the quantity of gasoline on the ground as less than a gallon but Standard's maintenance man, Spillman, thought it was between ten and fifteen gallons. Nesbitt and Lindley shut off their respective valves and checked the hose connection for a faulty gasket. Finding nothing out of order, they reconnected the lines and with a nearby water hose ran cold water on the fuel pump of the tractor to break the vapor lock, an accepted practice for that purpose.
 
 
 4
 Conventional measures for eliminating the hazard of spilled gasoline include washing it down a drain with a hose, throwing sand on it to dissipate its volatile vapors or, when the quantity is minute, wiping it up with waste. Although there was a drain a few feet from the accumulation of gasoline, no effort was made either by Nesbitt or Lindley to wash it away, though some of it was under the exhaust pipe of the tractor. When Nesbitt assumed the vapor lock was broken, he handed the hose to Lindley who let it down on the pavement. Nesbitt then attempted to start the tractor engine by manual choking. Warned by others that there was a fire, he leaped from his tractor without trying to use the fire extinguisher stowed therein. Some of Standard's employees tried to use hand fire extinguishers and later a large extinguisher, wheeled from the depot, which they were unable to operate and abandoned their efforts, realizing that the fire was out of control. Damage to the tractor and trailers was covered by insurance and is not in issue.
 
 
 5
 Standard Oil sought to recover for the entire damage to its property under the indemnity clause of the contract. The jury found negligence on the part of both parties and gave judgment for half of standard's stipulated damages, pursuant to paragraph eleven of the agreement which provided that in the case of joint negligence each party was liable for one-half of the total damages. Motions by both parties for judgment notwithstanding the verdict or in the alternative for a new trial, were denied and both appeal.
 
 
 6
 The Court instructed the jury that in its view there was no conflict in the evidence as to the negligence of Nesbitt but submitted to the jury an issue as to Standard's negligence with the charge that if both were negligent the total damages suffered by Standard should be reduced by one-half.
 
 
 7
 The record discloses that Nesbitt was an experienced driver of gasoline trucks for the carrier; that he understood fully the danger that resided in accumulated gasoline under his truck; that when he undertook to start the motor, after breaking the vapor lock, he knew there was gasoline on the pavement as a result of the leak; that some of it was under the tractor; that he knew his motor would sometimes backfire; that correct procedure, when gasoline is spilled, is to wash it down or cover it with sand; that gasoline on a surface like that at the depot would give off vapors and was dangerous; that there is always a little coughing and spitting of the motor after cooling it to break a vapor lock; that he had had trucks backfire before, though not under existing conditions. We find no error in the judge calling attention to Nesbitt's negligence in restarting his motor without making any effort to dissipate the accumulated gas, and gave the usual charge to the jury that it was judge of the facts.
 
 
 8
 The carrier makes little or no effort to vindicate the conduct of Nesbitt as being due care, in reactivating the motor. It contends that Nesbitt, in the unloading activities, became the loaned employee of Standard, by virtue of that clause in paragraph ten of the contract which reads: 'But all such loading and unloading shall be done by the Company.' The Court rejected this contention and found, as a matter of law, that Nesbitt continued to be the servant of the carrier in the unloading operation, based upon a rider, effective December 4, 1946, which provided that when the carrier's unloading pump is used Standard was to pay .02 cents per gallon for each gallon unloaded from the carrier's equipment into the storage tanks at destination. Whether this is a fair interpretation of the contract, we need not decide. This reservation in the agreement is clearly for the benefit of Standard and could be waived by it either expressly or by the practice of the parties. As to this practice, Nesbitt testified:
 
 
 9
 'Q. Now, in that pump house they have pumps that they use for the same purpose? A. Yes. We always use our pump on the White Crown (Ethyl); and the pump that they had at that time was slow and it would take a long time to pump it off. Where we could pump it and it would take about two hours to pump it off with their pump, we could pump it off in about fifty minutes.
 
 
 10
 'Q. Did Standard Oil give you any instructions to use the pump on your truck? A. Yes, we always did.
 
 
 11
 'Q. Did Charley Lindley-- Charley Lindley, as far as you were concerned, was the boss there? He was the guy you had to report to? A. Well, no, Charley wasn't actually the boss-- he just over-seen the unloading of the truck is all.
 
 
 12
 'Q. And that was his job, to oversee the unloading of the trucks? A. Yes.'
 
 
 13
 As the late Mr. Justice Cardozo observed in A Ministry of Justice, 35 Harvard Law Review, 113, at 121: 'The law that defines or seeks to define the distinction between general and special employers is beset with distinctions so delicate that chaos is the consequence.' Professor Talbot Smith, now Mr. Justice Smith of the Michigan Supreme Court, in 38 Michigan Law Review, 1222, in a scholarly exposition of the loaned servant problem, examined the various tests that have been applied and arrived at a somewhat similar conclusion. Observing that one who seeks an explanation of the borrowed servant cases, in terms of weighing the elements of control, is 'inexorably driven to the expedient of making and accepting 'desperate refinements,' etherial in substance and revolting in reason, in order to approach any semblance of reconciliation.' We recently concluded in Aluminum Company of America v. Ward, 231 F.2d 376, at page 380, that where there is divided authority, and the borrower falls short of the power to command, there is lacking the necessary element in determining surrender of control by the general employer to a temporary employer under the loaned servant doctrine. These concepts lead to the conclusion that each case must be decided upon its own circumstances and, where the facts are not in dispute, the question is one of law. While an analysis of Michigan cases does not disclose precisely controlling tests, the Michigan Supreme Court, in White v. Bye, 342 Mich. 654, 70 N.W.2d 780, 782, declared the rule in Standard Oil Company v. Anderson, 212 U.S. 215, 29 S.Ct. 252, 256, 53 L.Ed. 480, to be: 'the most important and significant.' In that case, it was said, in reliance upon Holmes C.J., in Driscoll v. Towle, 181 Mass. 416, 63 N.E. 922, "but the mere fact that a servant is sent to do work pointed out to him by a person who has made a bargain with his master does not make him that person's servant; more than that is necessary to take him out of the relation established by the only contract which he has made, and to make him a voluntary subject of a new sovereign." See Rockwell v. Grand Trunk Western Ry. Co., 253 Mich. 144, 234 N.W. 159.
 
 
 14
 In the light of Nesbitt's evidence as to the general practice in handling Ethyl gasoline at Standard's depot, we are of the view that Nesbitt was not the employee of Standard and that the Court was right in so holding and in so charging the jury. Nesbitt's negligence may not be attributed to Standard under the doctrine of 'respondeat superior.'
 
 
 15
 Likewise rejected must be Standard's contention that Nesbitt was guilty of wilful and wanton negligence, to the end that it may recover its full damages regardless of contributory negligence on its part. "Wantonly' means without reasonable excuse and implies turpitude, and an act to be done wantonly must be done intelligently and with design without excuse and under circumstances evincing a lawless, destructive spirit. It is a reckless disregard of the lawful rights of others, such a degree of rashness as denotes a total want of care, or a willingness to destroy, although destruction itself may have been unintentional.' McClure v. Steele, 326 Mich. 286, 40 N.W.2d 153, 157, 13 A.L.R.2d 160, Nesbitt's own danger negates a reckless disregard of the rights of others.
 
 
 16
 The dividing of the damages, in the event of joint negligence, is dictated by paragraph eleven of the contract which manifests the intention of the parties that the ordinary common law rules of negligence be thereby displaced. The indemnity agreement provides that the carrier agrees to indemnify the Company from and against any and all losses for injuries to persons or property, directly or indirectly, caused or resulting from any act or omission of the carrier and provides that if any such loss arises from or by reason of the joint or concurring proximate negligence of the parties, liability therefor shall be borne equally by them. The carrier contends that these recitals apply only in case of injury to third parties and not to that of the contracting parties between whom it asserts the common law of contributory negligence still applies. The District Judge found this to be a strained interpretation of the indemnity provision and we agree that it is. Courts will not disregard the plain language of a contract or interpolate something not contained therein. The language used by the parties is clear and unambiguous and cannot be ignored, however plausible the reasons advanced. Henrietta Mills v. Commissioner of Internal Revenue, 4 Cir., 52 F.2d 931.
 
 
 17
 It remains only to determine whether there was substantial evidence indicating negligence by Standard contributing proximately to the result. The Court thought that the failure by Lindley to warn Nesbitt of the danger in reactivating his motor constituted such negligence. While there are many cases which hold that there is no duty to warn one who is himself aware of danger, there was substantial proof of negligence, otherwise, in the failure of Lindley and Standard to exercise due care. Lindley had died before the trial but it is clear from the evidence that he knew of the spilled gasoline and its proximity to the exhaust pipe of the carrier's motor. Though he had the gardenhose in his hands and a drain outlet near, he failed to use the hose in dissipating the dangerous accumulation. The jury was warranted in assuming that Lindley was negligent in failing to resort to established practice in eliminating the danger. The evidence is also clear that the hand-extinguishers provided by Standard were either not in working order, or that its employees were not properly instructed as to their use, and also that the larger wheeled extinguisher was not in working order. The issue seems clear that the negligence of Standard co-operated proximately with the negligence of Nesbitt and that there was negligence by both parties to the litigation. Wherefore, the obligation of the parties to divide the damages imposed by their contract governs decision.
 
 
 18
 The Court mistakenly, and perhaps excusably, undertook to instruct the jury on the doctrine of res ipsa loquitur, since it is not recognized in Michigan, Camp v. Spring, 241 Mich. 700, 217 N.W. 917, and the case is not one for its application. The instrumentalities involved in the accident were not under the exclusive control of either party. Wigmore on Evidence, Sec. 2509. We do not, however, find the error prejudicial, since the charge failed to indicate the obligation of either party to go forward with evidence, or indicate the scope or limitation of the presumption that arises from its application.
 
 
 19
 It follows from what we have said that the cross appeal be dismissed and the judgment affirmed.