UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 08-1460

COMMONWEALTH GROUP-WINCHESTER PARTNERS, L.P.,

Plaintiff - Appellant,

v.

WINCHESTER WAREHOUSING, INCORPORATED; SILVER LAKE, LLC,

Defendants - Appellees.

Appeal from the United States District Court for the Western District of Virginia, at Harrisonburg. Glen E. Conrad, District Judge. (5:07-cv-00024-gec-bwc)

Argued: March 26, 2009                Decided: June 26, 2009

Before WILKINSON and SHEDD, Circuit Judges, and David A. FABER, Senior United States District Judge for the Southern District of West Virginia, sitting by designation.

Affirmed by unpublished opinion. Senior Judge Faber wrote the opinion, in which Judge Wilkinson and Judge Shedd joined.

**ARGUED:** John A. Lucas, MERCHANT & GOULD, PC, Alcoa, Tennessee, for Appellant. Patrick Christopher Asplin, LENHART & OBENSHAIN, PC, Charlottesville, Virginia, for Appellees. **ON BRIEF:** Chris Ashby, LECLAIR RYAN, Washington, D.C., for Appellant. Richard Armstrong, William Shmidheiser, LENHART & OBENSHAIN, PC, Charlottesville, Virginia, for Appellees.

Unpublished opinions are not binding precedent in this circuit.

FABER, Senior District Judge:

Commonwealth Group-Winchester Partners appeals the district court's grant of summary judgment in favor of Winchester Warehousing and Silver Lake on its breach of contract claim and the district court's dismissal of its claim for reformation based on mutual mistake. For the reasons set forth below, we affirm.

I.

A.

In 2003, Commonwealth Group-Winchester Partners, L.P., ("Commonwealth") and the appellees Winchester Warehousing, Inc., and Silver Lake, LLC, (collectively "WWW") commenced negotiations for the sale of approximately 40 acres of land owned by the appellees in Winchester, Virginia. Because the property was to be developed as a shopping center that would include a Wal-Mart Supercenter, WWW submitted a rezoning application to Frederick County seeking to have the property rezoned from rural to commercial. In order to obtain rezoning approval, WWW entered into a Rezoning Request Proffer with Frederick County in which they agreed to perform certain improvements in and around the property after the change in zoning.

By letter agreement dated July 10, 2003, and signed on July 14, 2003, WWW and Commonwealth entered into a "Proposed Sale and

2

Purchase of Real Estate" in which they agreed to the following

relevant terms:

> 1.    The sales price of said 40 acres shall total the sum of Nine Million Two Hundred Thousand and 00/100 Dollars, ($9,200,000.00).   Said sum represents the purchase price for the real estate, as well as the development costs associated with the Buyer and Seller's intended use for the Property.   The payment of said sum to the Seller shall be in a manner that is acceptable to both Seller and Buyer.
>
> 2.    This agreement shall be binding on both Buyer and Seller, their heirs, successors and assigns, for a period of 45 days, starting on the date this document is fully executed.   It is clearly expressed and understood by all parties that the term of this letter is to be used for the preparation of the real estate purchase agreement, acceptable to both Buyer and Seller, outlining all terms and conditions of this proposed real estate purchase.   **The Seller agrees not to accept any other offer for the Property during the 45 day term, or any extension thereof.**

JA 88 (emphasis in original).

Several months later, Commonwealth and WWW signed a Real

Estate Purchase Agreement with an effective date of September

17, 2003.   It provided:

> 1.    <u>PURCHASE AND SALE AGREEMENT</u>: Seller hereby agrees to sell and the Buyer hereby agrees to buy, on the terms and conditions of this Agreement, the fee simple interest, including both surface rights and mineral rights, in and to that certain real property of Seller located in the County of Frederick, State of Virginia, as outlined in red on the drawing that is attached hereto as Exhibit A (the "Property").   The parties agree that the Property shall include a new internal road (the "Boundary Road") [which] shall be located to the west of the Property and shall also include all property that is required to be dedicated for right-of-way as a result of the Proffer Work, as defined below.   The Boundary Road shall be located so that

3

after deducting any property that will be in the right-of-way of the Boundary Road or that will be dedicated as right of work as a result of the Proffer Work, the Property will be a minimum of forty (40) acres.

* * *

3. PURCHASE PRICE: The purchase price for the Property shall be the sum of Two Hundred Thousand and 00/100 Dollars ($200,000.00) per acre. It is contemplated that there will be forty (40) acres. . . . Seller will use its best efforts to insure that the acreage equals forty (40) acres. . . .

4. OFF-SITE WORK: In addition to paying the Purchase Price, the Buyer shall perform the off-site work that is described in the summary of proffers that is attached as Exhibit B (the "Proffer Work"). In addition, to the extent that the Proffer Work costs less than $1,200,000.00, the Buyer shall spend the difference between the cost of the Proffer Work and $1,200,000.00 in constructing the Boundary Road, provided, however, in no event shall the Buyer be required to construct the Boundary Road beyond the Northwest corner of the Property.

* * *

16. ENTIRE AGREEMENT: This Contract and the documents referred to in this Contract constitute the entire agreement between the parties, and there are no other conditions, covenants or agreements which shall be binding between the parties.

17. GOVERNING LAW: This Contract shall be governed by and shall be interpreted in accordance with the laws of the Commonwealth of Virginia.

JA 19-28.

Exhibit B to the Real Estate Purchase Agreement lists the Proffer Work required for the property, in accordance with the rezoning agreement with the county. JA 28. The total is

4

divided between WWW and Winchester Medical Center ("WMC").[1] The total cost of the Proffer Work was estimated to be $1,619,544, with WWW responsible for $868,024, WMC responsible for $516,200, and the Virginia Department of Transportation ("VDOT") responsible for the remainder. These estimates were provided by Charles Maddox, the project engineer retained by the appellees in connection with the rezoning of the property and later retained by Commonwealth to assist with its performance of the Proffer Work. JA 43-48, 1000-02. By the summer of 2004, however, the estimates for the share of the Proffer Work not allocable to WMC or VDOT had risen to approximately $1.6 million. JA 46, 1011.

Prior to closing, on July 22, 2004, WWW and WMC entered into a Memorandum of Understanding regarding the Proffer Work. It provided that "WMC shall be liable for 31.9% of the external road improvement estimated costs to include change orders and WWW shall be liable for 68.1% of the external road improvement estimated costs to include change orders." JA 41-46.

Commonwealth and WWW closed on the sale of the property on August 26, 2004. Days after closing, on August 31, 2004, WWW

---

[1] WMC owned the adjoining property and had made proffers as part of the rezoning process for its land. The two properties were being developed in cooperation to reduce development costs. JA 150.

and Commonwealth entered into a side agreement (hereinafter the "August 2004 Agreement") which dealt with the manner in which Commonwealth was to receive payment from WMC for its share of the Proffer Work. In essence, the August 2004 Agreement provided that WWW would receive payment from WMC and forward the monies to Commonwealth. More importantly for purposes of this appeal, the Agreement also contained the following recital:

> WHEREAS, under the terms of the [Real Estate Purchase] Agreement, Commonwealth Group has agreed to perform the work necessary to satisfy the Proffers, **with the responsibility for the payment for such work being allocated to Commonwealth Group and Winchester Warehousing - Silver Lake in the Agreement**;

JA 38-40 (emphasis added).

As of January 26, 2007, the total cost of the Proffer Work was $5,960,513.58, far above the initial estimate. Commonwealth sent a demand letter to WWW in which it stated that WWW was contractually obligated to pay half the costs of the Proffer Work in excess of the amount owed by WMC, a total of $2,029,554.87. WWW made no payments to Commonwealth in response to this demand or at any other time. JA 47-48.

B.

Invoking the court's diversity jurisdiction under 28 U.S.C. § 1332, on March 2, 2007, Commonwealth filed suit in the United States District Court for the Western District of Virginia. In an amended complaint, filed on May 4, 2007, Commonwealth lodged

6

three claims: Breach of Express Contract (Count I), Mutual Mistake and Reformation (Count II), and Quantum Meruit (Count III). Commonwealth contended that the Proffer Work totaled $5,960,513.58. Of that total, WMC was responsible for 31.9 percent, i.e., $1,901,403.83, leaving a balance of $4,059,109.75, of which WWW should pay its "fair share." JA 124. In the reformation count, Commonwealth contended that the parties intended that its share of the cost of the Proffer Work would not exceed $1.2 million and requests that, if the court finds that the terms of the agreements between the parties failed to provide for such an allocation, the court should reform the contract to include it on the basis of the parties' "mutual mistaken belief that the cost of the Proffer Work would not exceed $1.2 million." JA 125.

By Memorandum Opinion and Order dated August 31, 2007, the district court granted defendant's motion to dismiss Count II of the complaint, finding that there was no mutual mistake of fact that would warrant reformation of the Agreement.[2] JA 626. As to Commonwealth's claim for breach of express contract, however, the court found that the agreements in question, when considered together, raised an ambiguity with regard to the responsibility

_____

[2] In that same order, the court also dismissed Commonwealth's claim under quantum meruit, see JA 628, a ruling Commonwealth did not appeal.

7

for the payment of the cost of the Proffer Work.  Specifically, the district court found that the language in the Real Estate Purchase Agreement, which does not mention any allocation between the parties, and the August 2004 Agreement, which states that the Real Estate Purchase Agreement did include some allocation, appear to be inconsistent.  As a result, the court permitted the parties to submit extrinsic evidence to shed light on the parties' intent in entering into both agreements.

After considering such evidence, the court found that Commonwealth had failed to raise a genuine dispute of material fact with regard to the key issue of whether the agreements signed by the parties provide that WWW is responsible for payment of any portion of the cost of the Proffer Work in excess of $1.2 million.  JA 1334.  The district court found that the evidence "overwhelmingly" supported appellees' claim that the parties did not intend that WWW should bear the risk of any overage in the cost of the Proffer Work.  Id.  Accordingly, the district court granted WWW's motion for summary judgment on Commonwealth's claim for breach of express contract.  See id. This appeal followed.

C.

This court reviews a grant of summary judgment de novo, construing the facts in the light most favorable to the non-moving party.  Volvo Trademark Holding Aktiebolaget v. Clark

8

Machinery Co., 510 F.3d 474, 481 (4th Cir. 2007). "An award of summary judgment may be appropriately made only `if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(c)).

The Court of Appeals reviews de novo a district court's dismissal under Fed. R. Civ. P. 12(b)(6). Manning v. Fairfax County School Board, 176 F.3d 235, 237 (4th Cir. 1999) (citing Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993), cert. denied, 510 U.S. 1197 (1994)). "A complaint should not be dismissed for failure to state a claim upon which relief may be granted unless `after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)).

II.

A.

Under Virginia law, to prevail on a claim for breach of contract, a plaintiff must establish: (1) a legal obligation of a defendant to a plaintiff, (2) a violation or breach of that obligation, and (3) a consequential injury or damage to the plaintiff.  Hamlet v. Hayes, 641 S.E.2d 115, 117 (Va. 2007) (citing Caudill v. Wise Rambler, 168 S.E.2d 257, 259 (Va. 1969)).  Furthermore, Virginia law regarding the interpretation of contracts is well settled.  Bridgestone/Firestone, Inc. v. Prince William Square Assoc., 463 S.E.2d 661, 664 (Va. 1995).

> When contract terms are clear and unambiguous, a court must construe them according to their plain meaning. Foods First, Inc. v. Gables Associates, 244 Va. 180, 182, 418 S.E. 2d 888, 889 (1992); Winn v. Aleda Const. Co., 227 Va. 304, 307, 315 S.E.2d 193, 194-95 (1984). The law will not insert by construction for the benefit of a party, an exception or condition which the parties omitted from their contract by design or neglect.  Westbury Coal Mining v. J.S. & K. Coal, 233 Va. 226, 229, 355 S.E. 2d 571, 573 (1987).  Moreover, a court must construe the words as written and not make a new contract for the parties.  Berry v. Klinger, 225 Va. 201, 208, 300 S.E. 2d 792, 796 (1983).

Id.; see also Berry v. Klinger, 300 S.E.2d 792, 796 (Va. 1983) ("However inartfully it may have been drawn, the court cannot make a new contract for the parties, but must construe its language as written.")(internal citation omitted).  When all the parts of a contract "can be read together without conflict," a

10

court must give meaning to every clause. <u>Berry</u>, 300 S.E.2d at 796.

Whether particular documents are ambiguous is a question of law. <u>Musselman v. Glass Works, L.L.C.</u>, 533 S.E.2d 919, 921 (Va. 2000). If contract language is capable of being understood in more than one way, it is ambiguous. <u>Video Zone, Inc. v. KF & F Properties, L.C.</u>, 594 S.E.2d 921, 924 (Va. 2004). When contract language is ambiguous a court may admit parol or extrinsic evidence, "not to contradict or vary contract terms, but to establish the real contract between the parties." <u>Tuomala v. Regent Univ.,</u> 477 S.E.2d 501, 505 (1996); <u>see also</u>, <u>Video Zone, Inc.</u>, 594 S.E.2d at 924 ("When the terms of an agreement are ambiguous, a court will consider parol evidence to ascertain the intent of the parties.").

Considered in isolation, the Real Estate Purchase Agreement of September 17, 2003, is not ambiguous regarding who assumed the responsibility of paying for the Proffer Work. The responsible party is Commonwealth who, in the absence of any other provision regarding payment for the Proffer Work, agreed to pay the Purchase Price and perform the Proffer Work. Indeed, under the express terms of the contract, Commonwealth is the <u>only</u> party required to spend any money on the Proffer Work. JA 19-28 ("the Buyer shall spend the difference between the cost of the Proffer Work and $1,200,000.00 in constructing the Boundary

11

Road . . . ."). Under these circumstances, the word "perform" in the Real Estate Purchase Agreement must mean complete the work and pay for it. It is the only reasonable interpretation.

Commonwealth points to three other documents that, according to it, show WWW is responsible for paying for a portion of the Proffer Work and, accordingly, render the contract ambiguous. The first of these is the Proposed Sale and Purchase of Real Estate dated July 14, 2003, ("letter of intent") which provided for a sales price of $9.2 million, a figure that was intended to include both the purchase price for the real estate as well as the costs of the Proffer Work. Significantly, a provision capping Commonwealth's total investment at $9.2 million - like the one included in the letter of intent - was not a part of the Real Estate Purchase Agreement. Rather than creating a ceiling for Commonwealth's total cash outlay with respect to the property, the Real Estate Purchase Agreement actually created a floor of $9.2 million in which Commonwealth agreed to spend at least that amount on the purchase of the property, completion of the Proffer Work, and possibly the construction of the Boundary Road. The fact that the terms changed supports WWW's contention that it did not agree to the cap included in the letter of intent and indicates

12

that Commonwealth was also aware that its exposure would no longer be explicitly capped.[3]

According to Commonwealth, the July Memorandum of Understanding between WWW and WMC, providing that WMC was liable for 31.9% of the estimated costs for external road improvements and WWW was liable for 68.1%, see JA 41-46, establishes WWW's liability to pay a portion of the costs of the Proffer Work. However, Commonwealth was not a party to this Memorandum of Understanding. Accordingly, the document does nothing to establish WWW's responsibility for payment of the Proffer Work vis-a-vis Commonwealth.

The last document in support of Commonwealth's position that WWW is responsible to pay for some portion of the Proffer Work is the August 2004 Agreement. Significantly, this document was signed almost a year after the Real Estate Purchase Agreement and five days after the transaction closed. After considering extrinsic evidence on the issue, the district court found that the August 2004 Agreement was drafted and signed solely to guarantee payment to Commonwealth of the amounts due for the Proffer Work from WMC. The evidence showed that the parties had originally investigated the possibility of having

---

[3] A memorandum prepared by Commonwealth's attorney also confirmed that WWW rejected a contract that capped Commonwealth's total investment at $9.2 million. JA 734-36.

13

the Memorandum of Understanding between WWW and WMC assigned to Commonwealth, but they did not want to wait until WMC's next board meeting for approval of such an assignment. As a result, Commonwealth and WWW entered into the side agreement which stated, in pertinent part, "WHEREAS, under the terms of the Agreement, Commonwealth Group has agreed to perform the work necessary to satisfy the Proffers, with the responsibility for the payment for such work being allocated to Commonwealth Group and Winchester Warehousing-Silver Lake in the Agreement."

The evidence is undisputed that the August 2004 Agreement was not intended to alter or explain the provisions for payment of the Proffer Work contained in the Real Estate Purchase Agreement. Rather, the evidence confirmed that the purpose of the August 2004 Agreement was to ensure that Commonwealth would receive the benefit of WWW's agreement with WMC.[4] Furthermore, without more, the fact that the Agreement purportedly allocates responsibility for the payment of the Proffer Work to both Commonwealth and WWW does not impose an obligation on WWW to pay for the costs of the Proffer Work. This is especially true given the lack of a specific allocation amount. It could very well be the case that the responsibility for the payment of the

---

[4] This evidence included a series of e-mails between the real estate agent, Commonwealth, and Commonwealth's attorney on August 12 and 13, 2004. JA 723-727, 1046-47.

14

Proffer Work was "allocated" to both Commonwealth and WWW as a group but that, based upon the agreements between the two, Commonwealth alone was obligated to pay for all the costs of the Proffer Work.[5]

Even assuming that the Real Estate Purchase Agreement was ambiguous, there is no extrinsic evidence to indicate that WWW agreed to be responsible for payment of the costs of the Proffer Work. Commonwealth, however, contends that it presented evidence to the district court which showed the intent of the parties was that Commonwealth would pay no more than $1.2 million to complete the Proffer Work. According to Commonwealth, at a minimum, the following evidence created a disputed issue of material fact:

> 1. An e-mail dated March 1, 2005, from Ronald Mislowsky, an engineer working on the project, to Becky Wright, Commonwealth's in-house engineer, in which Mislowsky said "As your interest in the improvements is capped at 1.2 mil, do you want to be briefed on the efforts to get the costs down?" JA 1172.
>
> 2. A draft pro forma financial statement on the project, prepared by Commonwealth to submit to Regions Bank, showing an expected reimbursement from WWW in addition to the expected reimbursement from WMC. JA 1174.

---

[5] If the allocation language in the August 2004 contract is interpreted in this manner, there is no inconsistency between the Real Estate Purchase Agreement and the August 2004 Agreement and, therefore, no ambiguity in the Real Estate Purchase Agreement.

15

3.    A November 2005 email from Kelley Mikels at Commonwealth in which she states that "we are only obligated by Agreement to pay $1.2m of the now estimated $4m, and they are not willing to pay the overages from their estimates."  JA 1176.

4.    The deposition testimony of Milton Turner and Timothy Scoggin, both from Commonwealth, indicating that both believed Commonwealth's total outlay for the Proffer Work was capped at $1.2 million. JA 1095, 1164.

As the district court found, all this evidence speaks only to Commonwealth's intent and does not demonstrate the parties' mutual intent was for WWW to pay for any portion of the Proffer Work.   While the evidence is undisputed that neither party anticipated the costs of the Proffer Work would exceed $1.2 million when they signed the Real Estate Purchase Agreement, it does not lead to a conclusion that WWW agreed to be responsible for some portion of the overage.   Indeed, common sense suggests otherwise.   First, under Commonwealth's theory, WWW would be responsible for the costs of the Proffer Work in excess of $1.2 million even though it had no control over the performance of the Proffer Work, including its timing, selection of vendors, costs, etc.   Second, Commonwealth never billed WWW for any costs of the Proffer Work or made a formal demand until January 2007, even though it had been sending invoices to WMC since November 2005.    Finally, throughout the course of this dispute, Commonwealth has changed the amount of its demand more than

16

once, underscoring the lack of any specific contractual obligation for WWW to pay a portion of the Proffer Work.

"[C]ourts will not write contracts for the parties to them nor construe them other than in accordance with the plain and literal meaning of the language used." Henrietta Mills, Inc. v. Commissioner of Internal Revenue, 52 F.2d 931, 934 (4th Cir. 1931). However, this is exactly what Commonwealth urges the court to do. In asking the court to find WWW responsible for payment of the Proffer Work in the absence of any language in the contract imposing such a responsibility, the court would, in effect, be writing the contract for the parties. Based on the foregoing, the district court did not err in granting summary judgment in WWW's favor.

B.

As an alternative to its breach of contract claim, Commonwealth sought reformation of the contract based upon the parties' mutually mistaken belief that the costs of the Proffer Work would not exceed $1.2 million. The district court dismissed Commonwealth's reformation claim, finding that there was no mutual mistake of fact.

A court may reform or rescind a contract in equity "on the ground of mutual mistake. The mistake must be common to both parties. A unilateral mistake will not invalidate a

17

contract." Langman v. Alumni Ass'n of Univ. of Virginia, 442

S.E.2d 669, 677 (Va. 1994) (internal citations omitted).

The Restatement defines "mistake" as "a belief not in accord with the facts." Restatement (Second) of Contracts § 151 (1981). "Furthermore, the erroneous belief must relate to the facts as they exist at the time of the making of the contract. A party's prediction or judgment as to events to occur in the future, even if erroneous, is not a `mistake' as that word is defined here." Id. at Comment a; see also Matter of Westinghouse Elec. Corp. Uranium Contracts Litig., 517 F. Supp. 440, 457 (E.D. Va. 1981)(holding that an erroneous prediction about the future is not a mutual mistake of fact). According to this court,

> In determining whether there has been a mutual mistake
> of fact, we must examine the facts as they existed at
> the time of the agreement. . . . A mutual mistake in
> prophecy or opinion may not be taken as a ground for
> rescission where such mistake becomes evident through
> the passage of time. What is today only a conjecture,
> an opinion, or a guess, might by tomorrow, through the
> exercise of hindsight, be regarded then as an absolute
> fact.

United States v. Garland, 122 F.2d 118, 122 (4th Cir.) (internal citation omitted), cert. denied, 314 U.S. 685 (1941).

As an illustration, the Restatement provides the following helpful example:

> A contracts to sell and B to buy stock amounting to a
> controlling interest in C Corporation. At the time of
> making the contract, both A and B believe that C

18

Corporation will have earnings of $1,000,000 during the following fiscal year. Because of a subsequent economic recession, C Corporation earns less than $500,000 during that year. Although B may have shown poor judgment in making the contract, there was no mistake of either A or B, and the rules stated in this Chapter do not apply.

Restatement (Second) of Contracts § 151 Comment a, illus. 2 (1981).

In dismissing Commonwealth's reformation count and finding that there was no mutual mistake of fact, the district court stated

There was an agreement between the parties regarding the sale of the property and the performance of the Proffer Work. Either [Commonwealth is] correct that the parties intended to allocate the cost of the Proffer Work between themselves or [WWW is] correct that the parties intended Commonwealth to bear the entire burden of the costs of the Proffer Work. Any estimates or predictions regarding the ultimate total of the cost of the Proffer Work were just that - predictions - and as such were not mutual mistakes of fact which would warrant reformation of the Agreement.

JA 626.

The district court's conclusion on this point is in line with other courts that have considered the issue. See, e.g., United States v. Southwestern Elec. Coop., Inc., 869 F.2d 310, 314 (7th Cir. 1989) (holding that electric cooperative could not avoid contractual obligations to power company under the doctrine of mutual mistake where mistake involved an erroneous prediction as to future costs of construction of power plant); see also Ryan v. Ryan, 640 S.E.2d 64, 68-69 (W. Va. 2006)

19

(parties' erroneous belief that asset provisions of agreements would generate sufficient income was not a mistake which would warrant reformation or voiding of agreements and listing cases).

Because the doctrine of mutual mistake does not apply to predictions of future costs -- which are just what the estimated costs of the Proffer Work were -- the district court did not err in dismissing Commonwealth's claim seeking reformation of the contract.

## III.

For the reasons stated above, the judgment of the district court is

AFFIRMED.